[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 1190 
Jack Livingston and John F. Porter III of Livingston Porter, Scottsboro, for appellant.
Robert G. Wilson, David C. Wear, and Nikki Parrish Scott of Wear Wilson, P.A., Fort Payne; and James S. Hubbard, Anniston, for appellee.
J. Theodore Jackson, Jr., Ronald G. Davenport, and Rachel Sanders-Cochran of Rushton, Stakely, Johnston Garrett, P.A., Montgomery, for amicus curiae Alabama Rural Elec. Ass'n, in support of appellant.
J. Robin Rogers of Strang, Fletcher, Carriger, Walker, Hodge Smith, P.L.L.C., Chattanooga, TN, for amicus curiae Tennessee Valley Public Power Ass'n. *Page 1191 
Cherokee Electric Cooperative ("Cherokee") appeals from a $3 million judgment of the DeKalb County Circuit Court; that judgment was based upon a jury verdict for Douglas M. Cochran, as administrator of the estate of John Ray Cochran, on a wrongful death claim. We affirm.
On November 29, 1991, a brush fire or woods fire occurred on Gray Hollow Road in a rural section of DeKalb County. John Ray Cochran was a volunteer fireman; he, along with others, responded to the fire. The evidence presented tends to show that as he was walking through an area covered with vegetation and brush, he came in contact with a 7,200-volt electrical distribution line owned by Cherokee that had fallen from a utility pole; Cochran was electrocuted.
The line in question served a few customers on Gray Hollow Road, but it extended for approximately one-half mile beyond the residence of the last customer. It was along the last half-mile of the line that the accident occurred. The line had fallen at an unknown time, after being severed by an unknown cause. The evidence tended to show that Cherokee relied on reports from the public to make it aware of downed lines and that because no customer had reported a service disruption Cherokee was unaware that its Gray Hollow Road line had fallen.[1]
The line was protected by a fuse located at the juncture of the Gray Hollow Road line with the main distribution line running along County Road 151. The fuse was designed to de-energize the line if it should come into contact with the ground; for an unknown reason, however, the fuse failed to de-energize the line when the break occurred and the line fell.
This appeal follows the second trial in this case. At the first trial the jury returned a verdict for Cherokee, but the trial court set that verdict aside because of juror misconduct and ordered a new trial; this Court affirmed the new-trial order, without opinion. Cherokee Electric Co-op. v. Cochran,665 So.2d 1035 (Ala. 1994)(table). The case was retried and presented to a jury on the issue whether Cherokee was negligent in the design, construction, or maintenance of the section of the line in question. At the close of the plaintiff's case and again at the close of its own case, Cherokee moved for a directed verdict. Both motions were denied. The jury returned a $3 million verdict for the plaintiff, and the court entered a judgment on that verdict. Cherokee filed a motion for a judgment notwithstanding the verdict or a new trial, or, in the alternative, to alter, amend, or vacate the judgment. The court denied the motion, and this appeal followed.
 I.
Cherokee argues that the trial court erred in denying its motion for a directed verdict and later its motion for a JNOV because, it claims, the plaintiff did not prove that Cherokee breached the requisite duty of care.
Initially, we note that a motion for a directed verdict is a procedural device by which one party tests the sufficiency of the other party's evidence. See, Rule 50(a),[2] Ala. R. Civ. P.;Alabama Power Co. v. Williams, 570 So.2d 589 (Ala. 1990); JohnR. Cowley Bros., Inc. v. Brown, 569 So.2d 375, 376 (Ala. 1990); J. Hoffman S. Guin, Alabama Civil Procedure § 8.37 (1990). Similarly, a motion for JNOV[3] simply "permits the trial court to revisit its earlier ruling denying the motion for directed verdact." Alabama Power Co. v. Williams,570 So.2d 589, 591 (Ala. 1990). The ultimate question, of course, as to either motion, is whether the nonmovant has presented sufficient evidence to allow submission of the case or issue to the jury for a factual resolution. Hoffman Guin, supra, at § 8.37. For actions filed after June 11, 1987, the standard of review applicable to both motions is the "substantial evidence rule." See, § 12-21-12(a), Ala. Code 1975; Koch v. State FarmFire Cas. Co., *Page 1192 565 So.2d 226, 228 (Ala. 1990). Thus a nonmovant must present "substantial evidence"[4] supporting each element of his cause of action or defense to withstand a motion for directed verdict or JNOV. This calls for "a purely objective determination of whether the party having the burden of proof has produced [sufficient] evidence [of a factual dispute] requiring resolution by the jury." Ex parte Oliver, 532 So.2d 627, 628
(Ala. 1988); and see, John R. Cowley Bros., Inc., supra.
Additionally, in reviewing a motion for directed verdict or JNOV, this Court must view all the evidence in a light most favorable to the nonmovant and must entertain such reasonable evidentiary inferences as the jury would have been free to draw. Williams v. Allstate Ins. Co., 591 So.2d 38 (Ala. 1991).
We must determine whether the plaintiff presented substantial evidence that Cherokee breached its duty of care. To do so, we must first consider what the duty of care requires.
While this Court has long held that companies engaged in the distribution of electricity are not subject to strict liability, it has held:
 " 'The duty of an electric company, in conveying a current of high potential, to exercise commensurate care under the circumstances, requires it to insulate its wires, and to use reasonable care to keep the same insulated, wherever it may reasonably be anticipated that persons, pursuing business or pleasure, may come in contact therewith. This statement of the rule implies that, in the absence of statute or municipal ordinance, it is not necessary to insulate wires which are so placed that no one could reasonably be expected to come in proximity to them.'"
Curtis on Law of Electricity, § 510 (as quoted in Alabama PowerCo. v. Mosley, 294 Ala. 394, 400, 318 So.2d 260, 264 (1975)); see Alabama Power Co. v. Alexander, 370 So.2d 252, 254 (Ala. 1979). In Bush v. Alabama Power Co., 457 So.2d 350 (Ala. 1984), this Court further held that the duty to insulate power lines or to protect them with fuses arises only where it is foreseeable that members of the public may come into contact with a wire.
Cherokee had protected the Gray Hollow Road line with a fuse, but the plaintiff argues that Cherokee nonetheless breached the applicable standard of care by failing to remove the line, to de-energize it, or to protect it with a smaller fuse at a point beyond where the last customer was served. "The ultimate test of a duty to use care is found in the foreseeability that harm may result if care is not exercised." Bush at 353. Therefore, whether Cherokee breached its duty of care depends upon whether it was reasonably foreseeable that members of the public would come to harm resulting from contact with the line in the absence of such measures as placing a fuse on the line at a point past the residence of the last customer, de-energizing the line, or taking it down.
When viewed in the light most favorable to the plaintiff, the nonmovant, the evidence shows: John Ray Cochran was killed when he came into contact with an electrical distribution line owned by Cherokee. The portion of the line along which the accident occurred served no customers. Because Cherokee usually relies on customer reports to learn of downed lines, Cherokee did not know that this line had fallen. The line was protected by a fuse, but the fuse was located at the point where the line branched off from the main line running along County Road 151; there was no fuse on the line after the location of the last customer. The fuse failed for an unknown reason. It is a common industry problem for lines to fall and for fuses to fail to de-energize the fallen lines. Permanently de-energizing the line would have been relatively inexpensive, requiring a crew of three men less than an hour to complete the task.
The testimony of the various experts conflicted as to whether industry standards required that Cherokee take one or more of the protective measures described. The experts disagreed about the safety of lines like the Gray Hollow Road line and about the reliability and placement of fuses. *Page 1193 
Based on the evidence presented, we conclude that the plaintiff did present substantial evidence that raised a jury question as to whether Cherokee had met its duty of care. "Where the facts, upon which the existence of a duty depends, are disputed, the factual dispute is for resolution by the jury." Alabama Power Co. v. Alexander, 370 So.2d 252, 254 (Ala. 1979). Given the evidence in the record, reasonable persons could disagree as to whether it was reasonably foreseeable that members of the public could come into contact with the line in question. The trial court therefore properly denied Cherokee's motions for directed verdict and JNOV.
 II.
Cherokee also argues that the trial court erred in denying its motion for a new trial. Cherokee contends that it was entitled to a new trial because the trial court, in its order denying the new trial, referred to the line as "abandoned." Cherokee argues that the use of that word to describe the part of the distribution line in question in this case amounts to the adoption of an incorrect standard of law. This Court has written:
 " 'It is well established that a ruling on a motion for a new trial rests within the sound discretion of the trial judge. The exercise of that discretion carries with it a presumption of correctness, which will not be disturbed by this Court unless some legal right is abused and the record plainly and palpably shows the trial judge to be in error.' "
Hosea O. Weaver Sons, Inc. v. Towner, 663 So.2d 892, 895
(Ala. 1995) (quoting earlier cases). Applying the principle stated in Hosea O. Weaver Sons, we reject Cherokee's argument on this point. Cherokee has failed to demonstrate that any legal right was abused or that the decision of the trial court was plainly and palpably wrong.
 III.
Cherokee next argues that the trial court erred in allowing one of the plaintiff's witnesses, Steve Sax, to testify as an expert. It argues that Sax did not testify based on his knowledge of prevailing industry practices, but only upon his knowledge of the preferences and practices of the electric distribution system of which he was the manager. Cherokee claims that it is evident from his testimony that his opinions were based solely on his experience in that system. It asserts that such limited knowledge does not qualify him as an expert. The plaintiff argues that, as the manager of the other principal electrical utility in DeKalb County, Sax was qualified to testify about industry practice in the area.
It is well settled that the determination of whether a witness will be allowed to testify as an expert is a matter within the discretion of the trial court. Griffin v. Gregory,355 So.2d 691, 692 (Ala. 1978). The trial court's determination on that question will not be disturbed on appeal unless the court has abused its discretion. Id. at 692. Sax was questioned about his education, his professional background, and his experience, and the trial court allowed him to testify as an expert. After a review of the record, we do not find that the trial court abused its discretion.
 IV.
Cherokee next argues that the $3 million punitive damages award was excessive and violated its due process rights guaranteed by theFourteenth Amendment of the United States Constitution.
The determination of damages in wrongful death cases is governed by § 6-5-410, Ala. Code 1975, which authorizes punitive damages but does not authorize compensatory damages. EstesHealth Care Centers, Inc. v. Bannerman, 411 So.2d 109, 112
(Ala. 1982).[5] *Page 1194 
The constitutionality of Alabama's Wrongful Death Statute was challenged in a case that was appealed to the Supreme Court of the United States. In that case, Louis Pizitz Dry Goods Co. v.Yeldell, 274 U.S. 112, 47 S.Ct. 509, 71 L.Ed. 952 (1927), the Supreme Court held that Alabama could authorize the recovery of punitive damages for simple negligence if death resulted, without violating a defendant's constitutional rights, stating: "We cannot say that it is beyond the power of a legislature . . . to attempt to preserve human life by making homicide expensive."[6] 274 U.S. at 116, 47 S.Ct. at 510.
Even though the Supreme Court of the United States has held that Alabama can "attempt to preserve human life by making homicide expensive," we do not believe that the Supreme Court meant to say that a jury is free to exercise unbridled discretion in determining the amount of damages to impose in death cases. Claims that a particular jury verdict awarding punitive damages is excessive and violates due process protections must be reviewed by applying the three "guideposts" set out in BMW of North America, Inc. v. Gore, 517 U.S. 559,116 S.Ct. 1589, 134 L.Ed.2d 809 (1996). In BMW, the United States Supreme Court held that a punitive damages award that had survived the reasonableness review applied by this Court nonetheless exceeded the boundaries of awards allowed by the Due Process Clause of theFourteenth Amendment to the Federal Constitution. In BMW the Supreme Court set out three "guideposts" for a reviewing court to consider in determining whether a particular punitive damages award exceeds the bounds of due process: (1) the degree of reprehensibility of the defendant's conduct; (2) the ratio of the compensatory damages award to the punitive damages award; and (3) the difference between the punitive damages award and comparable awards in similar cases. 517 U.S. at 575-584, 116 S.Ct. at 1598-1603.[7]
We now review the jury verdict, using not only the three guideposts set out by the United States Supreme Court inBMW, but also the principles of review this Court set forth inGreen Oil Co. v. Hornsby, 539 So.2d 218 (Ala. 1989), andHammond v. City of Gadsden, 493 So.2d 1374 (Ala. 1986):
(1) Ratio of Punitive Damages to Compensatory Damages:
Alabama law allows no compensatory damages in a wrongful death case. This factor, therefore, does not apply here.
(2) Reprehensibility: The jury found that it was reasonably foreseeable that members of the public could come into contact with Cherokee's 7,200-volt electric distribution line and that such contact could cause severe personal injury or death. Because a state can make homicide expensive, we hold that Cherokee's conduct was sufficiently reprehensible, in law, to support the jury's verdict awarding $3 million in punitive damages.
(3) Similar Civil and Criminal Sanctions: Alabama law does not impose specific limits on the amount that may be recovered in wrongful death actions like this one, but we have considered how the award of punitive damages in this case compares with awards affirmed in other wrongful death cases this Court has reviewed. In General Motors Corp. v. Johnston, 592 So.2d 1054
(Ala. 1992), this Court affirmed an award of $7.5 million in a wrongful death action based on a claim that General Motors had defectively designed its 1988 Chevrolet 2500 series pickup truck and had failed to inform its customers about the truck's tendency to stall. In Burlington Northern R.R. v. Whitt,575 So.2d 1011 (Ala. 1990), a wrongful death action based on a claim of negligence or wantonness arising from a collision between a locomotive and a tractor-trailer truck at a railroad crossing, *Page 1195 
this Court stated that "[a]s the only appellate court with the ability to assure some degree of uniformity in the area of punitive awards, we must also determine whether the award is excessive when compared to awards in similar cases,"575 So.2d at 1024; it affirmed the judgment awarding $15 million, conditioned on the plaintiff's accepting a $10 million remittitur. In an even more similar case, Alabama Power Co. v.Turner, 575 So.2d 551 (Ala. 1991), this Court affirmed an award of $3.5 million in a wrongful death action based on a claim that Alabama Power Company had negligently caused the death of a person who was electrocuted when he came into contact with an energized guy wire.
Based on our review of awards in other wrongful death cases, we conclude that this factor does not tend to require a remittitur.
(4) Profitability of Conduct: Cherokee's only "profit" from the conduct resulting in Cochran's death was the money it saved by not sending work crews out to de-energize lines such as the portion of the one on Gray Hollow Road that served no customers or to protect them with one of the other measures described above. The evidence before this Court is not sufficient for us to determine the precise amount of those savings. However, the testimony did reveal that de-energizing such lines would require a three-person work crew less than an hour to complete. Whatever profit Cherokee realized was minimal.
(5) Financial Position of the Defendant: The evidence before this Court indicates that Cherokee's net assets in 1991 totalled $9,225,000. Thus, the jury award of $3 million represents roughly one-third of the Cherokee's net assets in that year. However, the evidence also indicates that Cherokee maintains insurance coverage for this kind of loss, and, based on the evidence before us, we cannot see that the award will affect the insurability of the Cherokee in the future.[8]
(6) Costs of Litigation: We note that this case has been tried twice and has been vigorously prosecuted and defended. This factor does not suggest that the award is excessive.
Considering the jury award in light of these six factors, we conclude that the reprehensibility of Cherokee's conduct outweighs those factors that would tend to call for a reduction of the award. We, therefore, conclude that the $3 million award was not excessive and thus did not violate the defendant's due process rights.
 V.
Cherokee also argues that portions of the plaintiff's closing argument were highly prejudicial and that the trial court erred in allowing those portions of the argument. The plaintiff's counsel stated in his argument. "There is no price that you can pay for a daddy." Cherokee argues that this was an impermissible appeal to the jury for compensatory damages, and cites in support of this argument this Court's decision inHardin v. Sellers, 270 Ala. 156, 117 So.2d 383 (1960). Cherokee's reliance on that case is misplaced. In that case, the plaintiff's attorney clearly asked the jury to award compensatory damages; the plaintiff's attorney in this case did not do that.
The plaintiff's counsel also told a short story in his closing argument concerning Queen Elizabeth (presumably Queen Elizabeth I). The plaintiff's counsel stated that the Queen had been the wealthiest woman in the world. He told the jury that on her deathbed she stated that she would trade all her possessions for a few more days of life. After reviewing of the record, we conclude that the arguments of the plaintiff's counsel were not so inflammatory that the judgment should be reversed for the trial court's refusal to instruct the jury to ignore them.
Upon consideration of the record, the briefs, and the oral arguments presented to this Court, we conclude that the judgment of the trial court is due to be affirmed.
AFFIRMED.
HOOPER, C.J., and SHORES and HOUSTON, JJ., concur.
KENNEDY, COOK, and SEE, JJ., concur in the result.
[1] Trial testimony indicated that one person had seen the fallen line a few days before Cochran's death, but that that person did not report the fallen line to Cherokee.
[2] We note that Rule 50(a) has renamed this motion as a "motion for judgment as a matter of law." See Committee Comments to October 1, 1995, Amendment to Rule 50.
[3] The 1995 amendment to Rule 50, Ala.R.Civ.P., renames the JNOV motion as a "renewal of the motion for a judgment as a matter of law." See note 2.
Assurance Co. of Florida, 547 So.2d 870, 871
[4] "Substantial evidence" has been defined as "evidence of such weight and quality that fair-minded persons in the exercise of impartial judgment can reasonably infer the existence of the fact sought to be proved." West v. Founders Life (Ala. 1989); see Ala. Code 1975, § 12-21-12.
[5] In Alabama, the only damages available in wrongful death actions are punitive in nature. Even though some members of this Court have questioned the appropriateness of this Court's interpretation of Alabama's Wrongful Death Statute, see, e.g.,Tatum v. Schering Corp., 523 So.2d 1042 (Ala. 1988) (Houston, J., dissenting), a majority of this Court has refused to change that interpretation, as has the Legislature. See, LemondConstr. Co. v. Wheeler, 669 So.2d 855, 864 (Ala. 1995) (Maddox, J., concurring), for a discussion of the fact that when the Legislature considered major "tort reform" legislation in 1987, it elected not to change the law of Alabama in wrongful death actions relating to this Court's interpretation that allows only punitive damages in a wrongful death case and allows no apportionment among joint tortfeasors.
[6] The issue presented in that case was whether a state may authorize punitive damages for mere negligence; the Supreme Court held that it may. Louis Pizitz Dry Goods Co. v. Yeldell,274 U.S. 112, 47 S.Ct. 509, 71 L.Ed. 952.
[7] On remand of the BMW case, the Justices of this Court, in several separate opinions, applied the guideposts set out by the Supreme Court. See BMW of North America, Inc. v. Gore,701 So.2d 507 (Ala. 1997).
[8] Cherokee argues in its brief that "the amount [of the award]may affect the insurability of the Cooperative in the future." (Emphasis added.) *Page 1196