773 So.2d 990 (1999)
David McKOWAN, M.D., and Timothy G. Day, M.D.
v.
Charles C. BENTLEY.
1971357.
Supreme Court of Alabama.
August 27, 1999.
*991 Richard B. Garrett and William H. Webster of Rushton, Stakely, Johnston & Garrett, P.A., Montgomery, for appellants.
James Harvey Tipler of The Tipler Law Firm, P.C., Andalusia; and David Luther Woodward, Pensacola, Florida, for appellee.
*992 PER CURIAM.
This is a medical-malpractice, wrongfuldeath case filed by plaintiff Charles C. Bentley against defendants David McKowan, M.D., Timothy G. Day, M.D., and Community Hospital of Andalusia, Inc. The claims against the hospital, dismissed before trial, are not before us. Bentley's complaint alleges that Drs. McKowan and Day breached the applicable standard of care in performing gastric bypass surgery on his wife, Nellie Bentley, and in failing to manage her post-operative infection and that these breaches in the standard caused her death. A jury found for the plaintiff and awarded $2 million in damages.
The defendants then filed motions for new trial, judgment notwithstanding the verdict, and remittitur. The trial judge held a hearing on these motions on March 4, 1998, and invited briefs and proposed orders from both parties. On March 19, 1998, he issued the following memorandum:
MEMORANDUM
"The Court has under submission the motions of Defendants for New Trial, Judgment Notwithstanding the Verdict, and Remittitur. The Court held a hearing on Defendants' motions on March 4, 1998 and invited briefs and proposed orders from both parties. Copies of the proposed orders are being filed with this memorandum.
"This is a case in which the Court disagrees with the verdict of the jury. Defendants correctly observe in their proposed order that the main issue in this case centers around the Defendant surgeons' handling of an infection that Mrs. Bentley developed. Plaintiff's expert opined that Defendants failed to respond to the infection (which was not caused by fault of Defendants) with proper treatment. Defendants' experts testified that Defendants handled the treatment appropriately, although the post-operative infection eventually proved fatal. The Court would have concluded from the evidence in this case that Defendants followed a recognized method of treatment which they believed best, although Plaintiff's expert believed his method of treatment was far superior. In resolving a motion for judgment notwithstanding the verdict or motion for judgment as a matter of law, the Court must view all evidence in a light most favorable to nonmovant and must entertain such reasonable evidentiary inferences as the jury would have been free to draw. Thus, the Court must recognize the jury's prerogative to accept fully the opinions of Dr. Gary Kirchner that Defendants' response to the unanticipated post operative infection suffered by Mrs. Bentley did not meet the standard of care.
"As to Defendants' motion for new trial or remittitur, the Court is prohibited by law from disturbing the verdict of the jury unless the Court concludes that the verdict is legally infirm. Other than the size of the verdict, there is little evidence that the verdict is tainted by actual bias, passion, prejudice, corruption, or other improper motive on the part of the jury.
"The Court has reviewed the verdict in view of the six factors recently outlined by the Supreme Court in [Cherokee Electric Cooperative v. Cochran, 706 So.2d 1188 (Ala.1997)], a case cited by Plaintiff although, according to Westlaw as of the date of this memorandum, it has not yet been released for publication. The six factors enumerated therein, however, appear to be consistent with the Supreme Court's past adherence to BMW of North America v. Gore, [517 U.S. 559], 116 S.Ct. 1589[, 134 L.Ed.2d 809] (1996) as well as Green Oil Co. v. Hornsby, 539 So.2d 218 (Ala.1989), and Hammond v. City of Gadsden, 493 So.2d 1374 (Ala.1986).
"The trial judge, however, understands the review outlined in Cochran to be broader in scope than the three-prong test set forth in BMW. BMW *993 appears to focus upon (1) the degree of reprehensibility of Defendant's conduct, (2) the ratio of the punitive damages award to the actual harm inflicted on Plaintiff, and (3) a comparison of the punitive damages award here and comparable awards in similar cases.
"Were these factors the limit of the Court's inquiry, Defendants' case for a new trial or remittitur would be much stronger for the Court knows of no really similar cases from this circuit in which punitive damages of such magnitude have resulted from a physician's mere negligence, and the Court agrees fully with Defendants' suggestion that, even if there were negligence, there is no evidence that the `doctors were incapacitated, acting out of ill will, that they refused to see or treat Mrs. Bentley, or that they did anything other than try to help Mrs. Bentley and correct her problems.' Further, the Court notes that Plaintiff's expert Dr. Kirchner acknowledged at one point the honesty of Dr. McKowan's records. There is no evidence of concealment or subterfuge of the kind present, for example, in Campbell v. Williams, 638 So.2d 804 (Ala. 1994), or the unreported Moore case from this circuit referenced by Plaintiff's counsel during oral argument on March 4, 1998.
"However, the six-factor approach in Cochran, which appears to be the rule of law, requires consideration of additional factors. The first is the profitability of Defendants' conduct. There is no evidence that Defendants profited from their method of treatment as compared to Dr. Kirchner's suggested treatment.
"Second, the Court must consider the financial position of Defendants. Plaintiff cites the case of Sheffield v. Andrews, 679 So.2d 1052 (Ala.1996), for the proposition that the financial position of Defendants is the most important of the Hammond and Green Oil factors. This most important factor weighs heavily in favor of sustaining the verdict for it will have little actual financial impact on Defendants personally, as full insurance coverage has been readily acknowledged.
"Finally, the six-factor approach invites consideration of the costs of litigation. The Court knows from its experience that the bringing of a medical malpractice action is very expensive.
"Applying all six Green Oil/Hammond/BMW factors identified in Cochran, and recognizing the well established rule that the Court may not substitute its own view for that of the jury, an order denying Defendants' post-trial motions for judgment as a matter of law, new trial, or remittitur shall issue in this cause.
"DONE this the 19th day of March, 1998.
 "/s/ Jerry E. Stokes
 "CIRCUIT JUDGE"
On the same date, the trial court issued the following order:
"ORDER
"This matter is now before the Court on Defendants' Motions for New Trial, Judgment Notwithstanding the Verdict and Remittitur. The Defendants argue that the verdict is excessive and due to be set aside or reduced. Upon review the Court makes the following findings of fact and law.
"The Supreme Court gives guidelines for the trial Court to apply in the analysis of a case where the Defendants contend that there is an excessive award of damages. Alabama law establishes that a remittitur or a new trial should not be ordered on the grounds of excessiveness of the jury's verdict except where the Court can clearly see that the verdict is tainted by bias, passion, prejudice, corruption, or other improper motive or cause on the part of the jury. There was absolutely no testimony nor inference therefrom that the Plaintiff's decedent was guilty of any contributory negligence. The Trial Court has not been *994 able to determine any factor which could be considered as bias, passion, prejudice, corruption, or other improper motive by the jury.
"A question has been raised with regard to jurors Pittman and Morgan in that Defendants contend the jurors in question had bad feelings and ill will toward doctors in general and Defendant Day in particular. On this point the Court finds that there was no evidence of any impropriety, bias or prejudice on the part of these jurors and that they were qualified to serve as jurors in this case. Both jurors testified that they had no bad feelings toward doctors and that no extraneous factors influenced their verdict.
"Defendants have presented no evidence that the verdict would harm them financially and this Court is mindful that evidence has been presented that the verdict will be fully covered by insurance. The Defendants admit that the verdict will not impact them financially at all. Therefore, the impact of the verdict on the Defendants is not sufficient to overcome the presumption of correctness in favor of the jury's verdict.
"The Court cannot call to mind, nor have the attorneys for the Defendants pointed out to the Court, any factor that would be construed to indicate bias, prejudice, corruption, or other improper motive or cause on the part of the jury other than the size of the verdict. The trial Court finds that the $2 million verdict is not the result of bias, passion, prejudice, corruption, or other improper motive or cause. (The trial court is frank to say that had it tried this case without a jury, it would have reached a different conclusion than the jury. However, the trial court cannot substitute its opinion for that of the jury.)
"It is, therefore, ORDERED, ADJUDGED and DECREED by this Court that the Defendant's Motions for New Trial, Judgment Notwithstanding the Verdict and Remittitur should be and are hereby denied.
"DONE this the 19th day of March, 1998.
 "/s/ Jerry E. Stokes
 "Circuit Judge"
The facts of the case are as follows: Mrs. Nellie Bentley, a 48-year-old woman who stood 5'4" and weighed 278 pounds, first sought advice about gastric bypass surgery from Dr. McKowan in January 1993. On March 8, 1993, Dr. McKowan, assisted by Dr. Day, performed Roux-En-Y gastric bypass surgery on Mrs. Bentley to alleviate her morbid obesity. Mrs. Bentley was discharged from the hospital two days later with no indication of any complications. Mrs. Bentley was instructed not to eat anything, but only to drink clear liquids. On March 14, Mrs. Bentley returned to see Dr. McKowan with redness and swelling around her incision. Dr. McKowan removed the sutures and found that Mrs. Bentley had a wound infection. There was no indication that she had an intra-abdominal infection at that time. On March 15, the drainage from her wound changed in character and amount and she was admitted to the hospital. A day later, Dr. McKowan, assisted by Dr. Day, operated on Mrs. Bentley to correct the intraabdominal abscesses that she had developed. The surgeons discovered a leakage of the unhealed anastomosis between the small bowel and the stomach and a large amount of purulent material in the abdominal cavity. Dr. McKowan drained the abscesses, washed out the abdominal cavity, and debrided the fascia back to healthy tissue. Mrs. Bentley was placed in intensive care. Mrs. Bentley was scheduled for re-exploratory surgery on March 17, so that the doctors could see the extent to which the surgery had successfully reduced her infection. Dr. McKowan, assisted by Dr. Day, operated again and found no disruption of the wound site. Dr. McKowan again washed the wound with saline solution and maintained her on appropriate intravenous antibiotics.
*995 On March 18, another follow-up surgery was performed. Following that surgery Mrs. Bentley was placed on a ventilator and began receiving total parenteral nutrition intravenously. On March 22, surgery was again performed on Mrs. Bentley. This time Dr. McKowan cut the front part of the stomach and placed a gastrostomy tube in the lower stomach to serve as a pressure relief outlet. On March 26, purulent drainage was discovered around the gastrostomy tube. The gastrostomy site was repaired. Mrs. Bentley showed some improvement on March 27.
At that point Dr. McKowan went on vacation and Dr. Day took over Mrs. Bentley's care. On March 28, Dr. Day performed surgery to remove purulent material in the abdomen. On May 30, Mrs. Bentley's sister had her transferred to UAB Hospital in Birmingham, where she died.
The plaintiff presented expert testimony from Dr. Gary Kirchner, who testified that Mrs. Bentley died because Dr. McKowan and Dr. Day did not properly manage her post-operative infection. Dr. Kirchner testified that the conduct of both physicians in managing the massive intra-abdominal infection fell well below the legally imposed standard of care in Alabama.
The defendants appeal the judgment of the trial court and argue that several trial court errors require a reversal. We first consider the defendants' contention that the trial court erred to reversal in striking veniremember Agnes Sears for cause. The record reflects that Ms. Sears indicated in her voir dire examination that she was a former patient of Dr. McKowan and that she "didn't see where he could go wrong." The defendants contend that as a result of the trial court's ruling, they were deprived of an otherwise impartial jury member. However, the trial court was merely following the reasoning in Dixon v. Hardey, 591 So.2d 3, 7 (Ala.1991), wherein this Court stated that the relationship of physician and patient constitutes prima facie evidence of probable prejudice on the part of the veniremember. We find no error as to the trial judge's exercise of his discretion in removing Ms. Sears for cause. Id. at 7.
The defendants also contend that the trial court erred in failing to grant a new trial in light of post-trial testimony that jury member Joan Pittman had failed to respond accurately during voir dire. They argue that Ms. Pittman was asked, along with the other members of the venire, whether she had any "negative feelings" regarding either defendant that would interfere with her ability to give each side a fair and impartial trial, and that she failed to respond that she had had a negative experience with Dr. Day when he failed to remember her as one of his patients shortly after he performed a hysterectomy on her. At the post-trial hearing, Ms. Pittman stated that, although she was bothered that Dr. Day did not know who she was, she did not remember the incident at the time that she was asked the question and therefore did not volunteer the information:
"Q. [Mr. Garrett] Have you ever told anybody that youthat there were some jurors who had problems with doctors and poor attitudes about doctors, saying they think doctors are gods and seeing them as taking advantage of people to benefit financially?
"A. Now, one of them said that doctors were gods,but I don't know about the benefiting financially. To be honest, I can't remember.
". . . .
"Q. Okay. Had you ever had any bad feelings or episodes where you felt that Dr. Day had not treated you appropriately or responded to you appropriately?
"A. No.
"Q. Was there not an episode where he did a test on you and when you went back into the hospital in a couple of days, Dr. Day didn't even know who you were and that upset you?

*996 "A. Well, yeah, he didn't know who I was.
"Q. All right. And that sort of upset you, bothered you?
"A. Well, it just made me think, well, you know, he's not doing anything with me right now, anyway you know. He told me what his suggestions were and gaveyou know, gave me a prescription for some medication and I don't know I'm just not the kind of person to just jump up and have surgery every time you turn around anyway, you know. I just don't do that, but I thought it was kind of odd, but then you have got to think about how many people they see, too, so that could indicate why he didn't remember me.
"Q. That episode occurred some years before this trial in November?
"A. Oh, yeah.
". . . .
"Q. Did it bother you, Ms. Pittman?
"A. That he didn't know me?
"Q. Yes, ma'am.
"A. Not really. It was just strange.
"Q. Have you ever told anybody that that bothered you?
"A. If I did, it would be the person that called me and questioned me."
This Court has said that the proper inquiry on a motion for a new trial based on improper or nonexistent responses to voir dire questions is whether the response, or the lack of response, resulted in probable prejudice to the movant. Union Mortgage Co. v. Barlow, 595 So.2d 1335, 1342-43 (Ala.1992). Not every failure of a prospective juror to respond correctly to a voir dire question will entitle the losing party to a new trial. The question of whether the complaining party was prejudiced by a juror's failure to answer voir dire questions is a matter within the discretion of the trial judge, whose ruling will not be reversed except for abusing its discretion. Id. The trial judge stated in his order that there was no evidence of any impropriety, bias, or prejudice on the part of this juror and that she was qualified to serve as a juror in this case. We find no abuse of discretion here.
The defendants next contend that the trial court erred to reversal in refusing to allow the defendants to rebut the plaintiff's counsel's interjections as to the cost of the medical services rendered by the defendants. They argue that the plaintiff was allowed to inquire into the amount of Dr. McKowan's charges for his care and treatment of Mrs. Bentley, but that the trial court prohibited the defendants from presenting evidence as to the plaintiff's health-insurance coverage to rebut that evidence.
In the course of the trial the defendants offered portions of the deposition of Charles Bentley, widower of Nellie Bentley. At a point in the reading, defendant's counsel offered page 76, line 18, which apparently had to do with the fact that Mrs. Bentley had health-insurance coverage. The plaintiff objected, and the trial judge sustained the objection. The colloquy that occurred with the trial judge reads as follows:
"(At which time, the parties approached the bench and the following occurred, outside the hearing of the jury:)
"MR. ALBRITTON: Your Honor, Harvey [Tipler] opened the door to this when he asked the doctor how much he charged.
"THE COURT: Well, that's correct. He did do that, but I had forgotten it.
"MR. TIPLER: But it's an irrelevant issue.
"MR. ALBRITTON: It has already been brought in by Harvey....
"MR. TIPLER: Well, then I'm going to go back into the exact charges with these doctors and everything they charged her for everything. I just asked what they charged. I didn't ask about....
"MR. ALBRITTON: No, you asked for figures....

*997 "THE COURT: When he asked that question, I really though he was directing it toward more like of a bias type that you ask any expert....
"MR. ALBRITTON: He mentioned a figure, Your Honor, and that opened the door to....
"MR. TIPLER: To his bias and also, in addition, even if that is an issue in this case and it's not. And whether he paid anything or not, it's still not an issue. So even if it is now an issue in the case and I don't think it is, it is still not admissible.
"MR. ALBRITTON: Your Honor, we would just say that it would be unfair for Harvey to be able to ask the doctor how much he charged and mention a specific figure without letting us show that he didn't have to pay anything.
"MR. TIPLER: It happens all the time in car wreck cases. It's a collateral source. And it doesn't come into evidence, even if I did open the door and I didn't.
"THE COURT: What do you mean it doesn't come in, even if you open the door?
MR. TIPLER: Assuming this was a car wreck case, so that the issue of them paying or what the insurance paid, that would not be an issue because of a collateral source, if it was admissible. But it's not.
"THE COURT: Well, you wouldn't be entitled to go into it in the car wreck case either.
"MR. TIPLER: That's right. He would not be able to. I would be entitled to go into the amount of the charges, but he would not be able to show the insurance paid any of it....
"MR. ALBRITTON: The reason he would be entitled to go into the charges is because it's an element of damages in that case. It is not here and he opened the door when he asked about it.
"MR. TIPLER: No, it's not an issue in the case.
"MR. ALBRITTON: If bias is all he was asking for, Judge, all he had to do was say did you charge for the admissions and he didn't have to say a specific number.
"MR. TIPLER: That indicates the extent of the bias.
"MR. ALBRITTON: That leaves the impression that his client has to pay the bills, which is untrue. And I should be able to show that.
"MR. TIPLER: I brought it in for another reason.
"THE COURT: I sustain the objection."
The record does not support the defendants' argument that they were prejudiced by the trial judge's ruling. We find no abuse of discretion here.
The defendants assert that there was insufficient evidence that any alleged breach of the standard of care by Dr. Day proximately caused the injury and death of plaintiff's decedent. However, the record reflects that the physician defendants were business partners. One assisted the other in the surgical procedures. The wrongfuldeath statute makes no provision to apportion damages between tort-feasors. § 6-5-410, Ala.Code 1975. The expert witness reasoned that in the face of a non-healing, massive intraabdominal infection, the procedures done three days running, March 16, 17, and 18, by both physicians fell far below the standard of care as it is announced in Alabama. There is substantial evidence from which the jury could infer from the testimony that both physicians breached the standard of care in their treatment of Mrs. Bentley and the management of her post-operative infection and thereby caused her death.
Finally, the defendants contend that the jury's award of $2 million in punitive damages is excessive. The plaintiff responds that the jury's award of punitive damages was not excessive under the circumstances that the patient was released to go home after only two days in the hospital and was subjected to at least seven *998 additional invasive procedures performed before her death.
The determination of damages in wrongful-death cases is governed by § 6-5-410, which authorizes punitive damages, but does not authorize compensatory damages. Estes Health Care Centers, Inc. v. Bannerman, 411 So.2d 109, 112 (Ala.1982). Claims that a particular jury verdict awarding punitive damages is excessive and contrary to due-process protections must be reviewed by applying the guideposts set out in BMW of North America, Inc. v. Gore, 517 U.S. 559, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996). This Court has reviewed the jury verdict by applying not only the three guideposts set out by the United States Supreme Court in BMW but also the factors set forth in Green Oil Co. v. Hornsby, 539 So.2d 218, 223-24 (Ala. 1989), and Hammond v. City of Gadsden, 493 So.2d 1374 (Ala.1986):
(1) Ratio of Punitive Damages to Compensatory Damages: This Court addressed the issue of the applicability of this factor in a wrongful death case in Tillis Trucking Co. v. Moses, 748 So.2d 874 (Ala.1999),[*] in these words:
"In Cherokee Electric [Coop. v. Cochran, 706 So.2d 1188 (Ala.1997)], the Court applied the three BMW v. Gore `guideposts,' as well as the Hammond and Green Oil principles of review, and affirmed a $3,000,000 wrongful-death judgment on a verdict in an electrocution case. As to the ratio of punitive damages to compensatory damages, the Court stated: `Alabama law allows no compensatory damages in a wrongful death case. This factor, therefore, does not apply here.' 706 So.2d at 1194. Alternatively, one could say that it does not apply as a mathematical ratio, but, if one considers the purpose behind this factor, it applies in the sense of proportionality between the punitive-damages award and the harm that was caused or was likely to be caused by the defendants' conduct. Certainly, the likelihood of death to a driver of a passenger automobile is great in the case of collision with a tractor-trailer truck fully loaded with logs and weighing approximately 90,000 pounds. Certainly, death is a great harm. Whether we say that the ratio factor does not apply, as we said in Cherokee Electric, or that it applies in principle without mathematical application, the first `guidepost' from BMW v. Gore does not require this Court to overturn more than a century of precedent based on law awarding only punitive damages in wrongful-death actions."
The punitive-damage award in this case is not disproportional to the loss of life caused by the defendants' malpractice.
(2) Reprehensibility. The trial judge states in his memorandum that there was no evidence that the doctors were incapacitated, that they were acting out of ill will, that they refused to see or treat Mrs. Bentley, or that they did anything other than try to help Mrs. Bentley and to correct her problems. Further, the plaintiffs expert, Dr. Kirchner, acknowledged at one point in the proceedings the honesty of Dr. McKowan's records. On the other hand, the testimony of the plaintiffs expert was emphatic that the defendants disregarded obvious signs of grave complications; omitted obvious, simple, effective measures for stopping the infection which eventually killed the patient; and repeatedly applied inappropriate measures virtually certain to exacerbate the infection. Two passages from the expert's testimony summarize his opinion:
"Q. Dr. Kirchner, you mentioned when you first started testifying that this was not a gastric by-pass morbid obesity problem, but was instead was [sic] handling of the complications. *999 Would you tell us what you mean by that?
"A. Like I said, I am not here to talk to you about whether Nellie Bentley should have had a morbid obesity operation. I'm not here to tell you whether or not the operation that was chosen was the right one or the wrong one. I'm here only to tell you that there was a complication of that procedure that was improperly handled on multiple occasions until finally the patient died." (R. 2579.)
"Q. Now, Doctor, you have described the management of this infection. In your opinion, based upon the definition of the standard of care and the breach thereof that I read to you in the Alabama law, did the management of this infection, which was caused by the leak, did that fall below the standard of care for Dr. McKowan and Dr. Day?
"A. Yes.
"Q. Was the breach of the standard of care in their improper management of this infection coming from the leak, is that breach extraordinarily high?
"A. In my opinion, yes.
"Q. Is it a close call?
"A. No.
"Q. If they had managed her care properly, if they had not breached the standard of care, in your opinion,well, let me ask it a different way. Did the improper management of her leakI'll say it again. My fault. Did the improper management as you described, the breach of the standard of care that you have described, did that, in your opinion, cause Nellie Bentley's death?
"A. Yes.
"Q. And if they had managed it properly, what are the chances that Nellie Bentley would be around today, healthy and happy?
"A. Ninety percent." (R. 2600-01.)
(3) Similar Civil and Criminal Sanctions: Alabama law does not impose specific limits on the amount that may be recovered in wrongful-death actions. This award is not an unusually large amount in comparison with awards affirmed in other wrongfuldeath cases this Court has reviewed. As this Court noted in Cherokee Electric Cooperative v. Cochran, 706 So.2d 1188 (Ala. 1997) (a wrongful-death case which affirmed a $3-million judgment), this Court affirmed a $7.5-million wrongful-death verdict against General Motors in General Motors Corp. v. Johnston, 592 So.2d 1054 (Ala.1992) (arising out of allegations of defects in Chevrolet pickup trucks) and remitted a wrongful-death verdict of $15 million to $10 million in Burlington Northern R.R. v. Whitt, 575 So.2d 1011 (Ala.1990).
(4) Profitability of Conduct. The trial court notes in his memorandum that there is no evidence that defendants profited from their method of treatment as compared to Dr. Kirchner's suggested treatment.
(5) Financial Position of the Defendant. As the trial judge noted, the defendants presented no evidence that the verdict would harm them financially.
(6) Costs of litigation. The trial judge's memorandum recites that the trial court knew from its experience that the bringing of a medical-malpractice action is very expensive. The defendants' briefs do not challenge this finding.
Considering the facts, the law, and the jury award in light of these six factors, we conclude that the judgment of the trial court, entered on the jury's verdict of punitive damages in the amount of $2 million, is due to be affirmed as is the order of the trial court denying the defendants' post-judgment motions.
AFFIRMED.
*1000 MADDOX, COOK, LYONS, BROWN, and JOHNSTONE, JJ., concur.
HOOPER, C.J., and HOUSTON and SEE, JJ., concur in the result.
HOUSTON, Justice (concurring in the result).
I have not had an easy time adjusting to this Court's interpretation of Ala.Code 1975, § 6-5-410, permitting a plaintiff to recover only punitive damages in a wrongful-death case. See Tatum v. Schering Corp., 523 So.2d 1042, 1047-63 (Ala.1988) (Houston, J., dissenting). However, the Alabama Legislature, by its actions in 1987 and in 1999, appears to have put its imprimatur on what I thought was this Court's mistaken interpretation of § 6-5-410. See Ala.Code 1975, § 6-11-28 (Ala. Acts 1987, Act No. 87-185, § 10, and Ala. Acts 1999, Act No. 99-3581(j)).
Even so, as I have written, I believe the Constitution of Alabama of 1901 gives a right to recover compensatory damages for wrongful death, independently of § 6-5-410. See King v. National Spa & Pool Institute, Inc., 607 So.2d 1241, 1253-54 (Ala.1992) (Houston, J., dissenting), in which I concluded as follows:
"Since one may waive a constitutional right, I would hold that a personal representative of a decedent could waive his constitutional right to a remedy for an injury that ultimately resulted in the wrongful deprivation of life and to any compensatory damages to which he would be constitutionally entitled between injury and death and subsequent to death, and proceed under § 6-5-410 to recover only what the majority of this Court has consistently held can be recovered under § 6-5-410. I would also hold that if the personal representative chose not to waive his decedent's constitutional right, then, in lieu of proceeding under § 6-5-410, he could recover all compensatory damages resulting from the injury, including death, and punitive damages too, but only if the acts of the defendant or defendants were such that punitive damages could have been recovered if death had not resulted."
607 So.2d at 1254.
I write all of this, somewhat in frustration, seeking to determine what we must do to assure that the amount of punitive damages awarded in an action brought under § 6-5-410 is not excessive, when the amount of punitive damages is challenged as being unconstitutionally excessive.
In Lance, Inc. v. Ramanauskas, 731 So.2d 1204 (Ala.1999), we remitted a $13-million award to $4 million in a wrongful-death case brought under Ala.Code 1975, § 6-5-391 (cause of action for wrongful death of a minor), for four reasons:
"1) the improper comments made by the parents' counsel regarding the availability of compensatory damages in a wrongful-death action and the parents' mental anguish as a measure of damages, 2) the trial court's improper use of pre-BMW [BMW of North America, Inc. v. Gore, 517 U.S. 559, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996)] fraud cases to evaluate the jury's award of damages in this case, 3) the vast difference in the amount of the jury's verdict in this case as compared to verdicts in similar cases, and 4) the disparity between the jury's verdict and the amounts of the pro tanto settlements entered into by the motel and Montgomery Coca-Cola."
None of these are Hammond-Green Oil factors or BMW v. Gore factors.
In Tillis Trucking Co. v. Moses, 748 So.2d 874 (Ala.1999), a wrongful-death action brought under § 6-5-410, we remitted a $7 million judgment to $1.5 million, based upon the financial condition of the defendant and the fact that the trial court's award was considerably higher than the awards in other wrongful-death cases. 748 So.2d at 888.
My frustration has to do with my belief that when we are dealing with compensatory damages awarded for harm or injury caused by an actionable wrong, our emphasis must be on assuring that the injured *1001 party is fully compensated for losses caused by the tortfeasor's wrong; however, when we are dealing with punitive damages, our emphasis must be on assuring that the tortfeasor is not punished excessively.
Like the trial judge, based upon the record I would have found for the physician defendants; however, again like the learned trial judge, I must acknowledge that I have no right to find the facts in this case. That right belonged to the jury. So, I accept the jury's finding of fact that the physicians negligently breached the standard of care in dealing with postoperative infection. Even so, I cannot say that their negligent postoperative treatment of infection amounted to a $2-million wrong. However, an award of $2 million no longer shocks my conscience.
The trial court wrote: "[T]he financial position of Defendants is the most important of the Hammond and Green Oil factors. This most important factor weighs heavily in favor of sustaining the verdict for it will have little actual financial impact on Defendants personally, as full insurance coverage has been readily acknowledged."
Is it unconstitutional to punish two negligent defendants by imposing on them a $2-million penalty that is explained or justified on the basis that it will have little actual financial impact on them because they have insurance coverage? I do not know; therefore, I cannot say that the trial court abused its discretion in failing to remit this $2-million punitive-damages award. However, I do know that the "guideposts" of BMW of North America, Inc. v. Gore, 517 U.S. 559, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996), do not work when a court is considering the question of excessiveness of a punitive damages award in a wrongful-death case brought under § 6-5-410.
NOTES
[*] Note from the reporter of decisions: The Court cited here its January 8, 1999, opinion in Tillis Trucking Co. That opinion was withdrawn November 12, 1999, on application for rehearing; on that date the Court substituted a new opinion. The material quoted here also appears in the substituted opinion.