SHAW, Justice.
Randall Boudreaux, M.D., Don Ortego, and Coastal Anesthesia, P.C. (“Coastal”), appeal from a $4,000,000 judgment, following a remittitur of a $20,000,000 jury verdict, against them and in favor of Paula Pettaway, as administratrix of the estate of Paulett Pettaway Hall, deceased, on her wrongful-death/medical-malpractice claim. We affirm.
Facts and Procedural History[1]
Boudreaux is a licensed, board-certified anesthesiologist and a principal of Coastal; Ortego is a certified registered nurse anesthetist and an employee of Coastal. Coastal is the exclusive provider of anesthesia at Springhill Memorial Hospital in Mobile (“Springhill”).[2]
In January 2006, Hall, a 32-year-old mother who had previously undergone gastric-bypass surgery and who presented at Springhill with complaints of nausea, vomiting, and abdominal pain, underwent an exploratory laporotomy at Springhill, dur *488 ing which Boudreaux and Ortego administered anesthesia. Hall died following that procedure, and Pettaway, Hall’s mother, was named administratrix of Hall’s estate.
Pettaway sued Boudreaux, Ortego, and Coastal (hereinafter referred to collectively as “the defendants”), alleging wrongful death. The ease proceeded to a jury trial. The evidence presented tended to establish — and her medical records reflected— that Hall had numerous risk factors placing her in the category of patients with a high risk of pulmonary aspiration during the administration of anesthesia via routine intubation. Despite those risk factors, however, Boudreaux and Ortego, who failed to physically examine Hall for the presence of aspiration risks or to review her medical records, employed a routine anesthetic induction as part of the intubation process instead of the rapid-sequence induction required for patients at risk for aspiration.[3] During the routine induction, Hall aspirated bile into her lungs, resulting in a decrease in her oxygen-saturation levels and, ultimately, her death as a result of aspiration pneumonitis.[4] At the conclusion of the case, the jury awarded Pettaway $20,000,000 in damages.
The defendants subsequently filed a joint motion seeking, alternatively, a judgment as a matter of law, a new trial, or a remittitur of the damages award. The trial court denied the defendants’ post-judgment motion, on the condition that Pettaway accept a remittitur of the jury verdict. Specifically, applying the guideposts established in BMW of North America, Inc. v. Gore, 517 U.S. 559, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996), and the factors articulated in Hammond v. City of Gadsden, 493 So.2d 1374 (Ala.1986), and Green Oil Co. v. Hornsby, 539 So.2d 218 (Ala.1989), the trial court remitted the $20,000,000 verdict to $4,000,000, which Pettaway accepted, and entered a judgment in Pettaway’s favor in the reduced amount. The defendants jointly appeal.

Discussion

I. New-Trial Grounds

On appeal, the defendants allege numerous errors by the trial court in denying their postjudgment request for a new trial.

A. Juror Misconduct

The defendants initially contend that the trial court exceeded its discretion when it failed to grant a new trial on the ground that 9 of the 12 jurors seated in this case allegedly “suppressed material information about their personal litigation histories .... ” (Defendants’ brief, at p. 9.) The defendants argue that the allegedly suppressed information included the fact that six of the jurors were plaintiffs in prior, undisclosed litigation, which, the defendants argue, “led to the selection of a jury that was sympathetic to [Pettaway] and doubtless predisposed against Defendants.” Id.
During voir dire, defense counsel asked the venire the following question:
“I need to know a little bit about lawsuits. We’re not going to get specific about them, I don’t think, but I need to know if any of the jurors or anyone in *489 your immediate family [has] ever been a plaintiff in a lawsuit; somebody that files suit to collect money or to straighten out a boundary line or anything like that.”
In response, prospective juror M.C. indicated that, approximately 15 to 18 years earlier, he had been the plaintiff in a fraud case that had proceeded to a successful trial; prospective juror A.D. disclosed that, approximately 5 years earlier, she had been the plaintiff in a suit resulting from an automobile accident; prospective juror D.A. disclosed that, approximately 3 years earlier, she had been the plaintiff in a discrimination-related employment suit; prospective juror H.T.H. responded that, the previous summer, she had filed a small-claims action; and prospective juror S.B. indicated that in 1997 she had filed a premises-liability action against a commercial establishment as the result of a fall.
After receiving the foregoing responses, defense counsel then asked the following questions of the venire:
“All right. Let’s look at the other side. Any of you ever been a defendant in a lawsuit? I know [prospective juror C.B.] has, but anyone else who’s ever been a defendant where somebody sued you to collect damages or make you move your fence or something like that? Anybody?
“I need to ask a question that’s kind of similar to one that’s been asked already. And other than [prospective juror K.H.] and [prospective juror M.C.], I need to know if any of you have ever had a dispute with a doctor or a hospital that went beyond being inconvenienced. I had to wait. Something that I call irritation, that’s the way I — what I’m looking for is have you ever had a dispute where you were upset enough that you wanted to change hospitals or change doctors or you thought something had been done wrong to you by a doctor or doctor or a hospital?”
Aside from receiving confirmation that three previously identified members of the venire, prospective jurors J.D., H.F.H., and G.P.S., “[had] something like that, [which would be] take[n] up separately,” defense counsel received no noted response to the foregoing questions.[5]
At the conclusion of the trial, which, as noted above, resulted in a verdict for Pett-away, the defendants moved for a new trial, claiming that posttrial investigations revealed that several of the seated jurors had failed to fully respond to the questions set out above regarding their personal-litigation histories. The defendants further argued that despite questioning by defense counsel during voir dire as to past disputes with health-care providers, four jurors failed to disclose past billing disputes with hospitals or other health-care providers, including two jurors who either had been discharged' in bankruptcy or had disputed debts owed to Springhill.[6]
Specifically, as reasserted in their brief to this Court, the defendants contend that a total of nine members of the seated jury purportedly failed to disclose the following during voir dire: M.F. had allegedly been a party in three prior civil suits, which she *490 failed to disclose, including a “real property lawsuit” (defendant’s brief, at p. 15) in which she was the plaintiff and that was pending at the time of the underlying trial and a sheriffs forfeiture action in which she was the named defendant and that also was pending at the time of the underlying trial; P.R., who was ultimately elected as the foreperson of the jury, had filed for bankruptcy protection in 1999 and in 2009 and had included among his scheduled creditors Springhill and other health-care providers, had been a named defendant in a civil-collection suit, and had also entered a guilty plea in a criminal “proceeding for committing a violation of unemployment compensation rules”; S.W. had been the plaintiff in a 2007 civil suit seeking damages as a result of an automobile accident, which action resulted in a verdict for the defense, and had filed two prior bankruptcy proceedings, one of which included a hospital as a creditor; K.A. had been a party to three prior bankruptcy proceedings, which he failed to disclose, and two of those bankruptcy filings included debts owed to health-care providers; A.T. had been a named defendant in an unlawful-detainer suit, which was disposed of by a consent judgment in November 2009; B.M. had been, in her official capacity, named as a defendant in two prior civil suits based on 42 U.S.C. § 1983, both of which were dismissed; N.W. had been a named defendant in a collection action; A.D. had requested pre-action discovery in 2009 related to potential fraud-based claims against two business entities in which she was the anticipated plaintiff, had filed a personal-injury action in 1997 on her daughter’s behalf, and had filed for bankruptcy in 1991 and included in her bankruptcy filing a debt owed to Spring-hill; and H.T.H. was, during the underlying trial, the plaintiff in a pending divorce action.
In light of the foregoing, the defendants contended that “a decidedly plaintiff-oriented jury was selected.... ” They maintained that they had been prejudiced by the jurors’ alleged failure to answer truthfully because, they said, complete and truthful responses “would have absolutely changed defense counsel’s analysis in voir dire and impacted the way in which he exercised peremptory strikes.... ” The defendants’ request for a new trial was accompanied by the affidavit testimony of defense counsel indicating that, had the nine jurors disclosed their involvement in previous litigation, he would have endeavored to determine the impact of that involvement “on their suitability to serve,” would have been able to potentially challenge some of the jurors for cause, and/or would have reevaluated the use of his peremptory strikes.
As to this issue, the trial court’s post-judgment order included the following factual findings:
“The parties devoted much time and effort to the issue of whether one or more of the jurors were nonresponsive to questions posed by Defendants’ counsel during the voir dire examination, and whether, in consequence, Defendants were prejudiced such that they did not receive a fair trial. The Court expressly finds and declares that there is no evidence that any of the jurors willfully, recklessly, negligently, or even innocently failed to properly respond to any of the questions posed by Defendants’ counsel. The questions as posed were not clear-cut and could quite reasonably have been construed by one or more of the jurors as asking about a very specific and very narrow field of prior types of legal proceedings. The Court observed the jurors during voir dire and saw no evidence of inattentiveness, hostility, or any other improper behavior. No proof was presented to substantiate *491 the Defendants’ claims that any of the jurors had a secret bias in favor of [Pett-away], and the Court rejects the suggestion that evidence of prior participation in a divorce case, an unemployment-compensation proceeding, a Rule 27 pre-action discovery proceeding, or bankruptcy proceedings should have been revealed in response to questions of whether those jurors had ever been a plaintiff or a defendant in a lawsuit. Even if there were substantial evidence that one or more veniremembers failed to disclose a lawsuit that was unambiguously within the scope of a clear question (and there is no such evidence), a new trial would still not be warranted because there is no evidence that Defendants were substantially prejudiced or that they were made to try their case before a less-than impartial jury as required by Bethea v. Springhill Memorial Hospital, 833 So.2d 1 (Ala.2002).
“Additionally, the evidence which was presented to the Court during the hearing on Defendants’ postjudgment motions was all a matter of public record. Were Defendants genuinely concerned before the trial or before the verdict was returned about the prospective jurors’ participation in prior bankruptcies and the like, they could have and should have looked at the available public records prior to or during the trial and afforded the Court an opportunity to take measures to address any concerns rather than waiting for a verdict to be returned, the jury discharged, and a judgment entered on the verdict.
“As for Defendants’ contentions that several of the jurors should have revealed the fact that they owed money to health-care providers who were not parties to this lawsuit, the Court notes 1) this issue was not timely raised, 2) the fact that a person may owe money does not necessarily make it a ‘dispute’ that might have been responsive to defense counsel’s question, 3) the fact that one or more jurors may have owed money to Springhill or other health-care providers is not material since Springhill was not a party, and 4) there has been no showing of prejudice to Defendants as a consequence of any such alleged nonrespon-siveness.”
(Emphasis added.)
In general, the standard of review applicable to this issue is whether the trial court exceeded its discretion in failing to grant a new trial on the ground of alleged juror misconduct:
“In [Ex parte ] Dobyne, [805 So.2d 763 (Ala.2001)], this Court explained the standard for granting a new trial based on a juror’s failure to answer questions on voir dire truthfully:
“ ‘The proper standard for determining whether juror misconduct warrants a new trial, as set out by this Court’s precedent, is whether the misconduct might have prejudiced, not whether it actually did prejudice, the defendant. See Ex parte Stewart, 659 So.2d 122 (Ala.1993).... The “might-have-been-prejudiced” standard, of course, casts a “lighter” burden on the defendant than the actual-prejudice standard. See Tomlin v. State, supra, 695 So.2d [157] at 170 [ (Ala.Crim.App.1996) ]...
“ ‘It is true that the parties in a case are entitled to true and honest answers to their questions on voir dire, so that they may exercise their peremptory strikes wisely.... However, not every failure to respond properly to questions propounded during voir dire “automatically entitles [the defendant] to a new trial or reversal of the cause on appeal.” Freeman v. Hall, 286 Ala. 161, 166, 238 *492 So.2d 330, 335 (1970).... As stated previously, the proper standard to apply in determining whether a party is entitled to a new trial in this circumstance is “whether the defendant might have been prejudiced by a veniremember’s failure to make a proper response.” Ex parte Stewart, 659 So.2d at 124. Further, the determination of whether a party might have been prejudiced, i.e., whether there was probable prejudice, is a matter within the trial court’s discretion. ...
“ ‘ “The determination of whether the complaining party was prejudiced by a juror’s failure to answer voir dire questions is a matter within the discretion of the trial court and will not be reversed unless the court has [exceeded] its discretion. Some of the factors that this Court has approved for using to determine whether there was probable prejudice include: ‘temporal remoteness of the matter inquired about, the ambiguity of the question propounded, the prospective juror’s inadvertence or willfulness in falsifying or failing to answer, the failure of the juror to recollect, and the materiality of the matter inquired about.’ ”
“ ‘Union Mortgage Co. v. Barlow, 595 So.2d [1335] at 1342-43 [ (Ala.1994)]....
“ ‘The form of prejudice that would entitle a party to relief for a juror’s nondisclosure or falsification in voir dire would be its effect, if any, to cause the party to forgo challenging the juror for cause or exercising a peremptory challenge to strike the juror. Ex parte Ledbetter, 404 So.2d 731 (Ala.1981)....If the party establishes that the juror’s disclosure of the truth would have caused the party either to (successfully) challenge the juror for cause or to exercise a peremptory challenge to strike the juror, then the party has made a prima facie showing of prejudice. Id. Such prejudice can be established by the obvious tendency of the true facts to bias the juror, as in Ledbetter, supra, or by direct testimony of trial counsel that the true facts would have prompted a challenge against the juror, as in State v. Freeman, 605 So.2d 1258 (Ala.Crim.App.1992).’
“Dobyne, 805 So.2d at 771-73 (footnote omitted; emphasis added).”
Ex parte Dixon, 55 So.3d 1257, 1260-61 (Ala.2010). See also Holly v. Huntsville Hosp., 925 So.2d 160, 165 (Ala.2005).
Although a large number of jurors did not disclose their complete litigation history and at least two jurors had litigation matters pending at the time of the underlying trial, upon full review it appears that, as the trial court concluded, the jurors’ alleged failure to disclose such history could be the result of the ambiguous and self-limiting nature of the questions asked by defense counsel. See Williston v. Ard, 611 So.2d 274, 277 (Ala.1992) (affirming a trial court’s denial of a new trial on the issue of improper juror responses in a medical-malpractice action where “the trial court could have found inadvertence on the part of the jurors or a misunderstanding of the question as it related to them” based on trial court’s holding that “the phrase ‘a lawsuit for damages’ ... summarily exclude[d] collection cases from consideration” and its finding “that [the defendant] ‘suffered no injury or prejudice when several potential jurors failed to disclose that they or members of their family had been defendants in debt collection cases’ ”); Ensor v. Wilson, 519 So.2d 1244, 1265 (Ala.1987) (declining to find that the trial court exceeded its discretion in deny *493 ing a request for a new trial based on jurors’ alleged failure to disclose previous litigation where the evidence supported the trial court’s finding of “inadvertence ... or a misunderstanding — at least on their part — of the questions as they related to them personally”). Specifically, as to the question seeking identification of jurors who had been prior plaintiffs, defense counsel appeared to limit his request to suits to “collect money” and to boundary-line disputes. Moreover, in matters such as bankruptcy proceedings or domestic-relations cases, which were not disclosed, the affected jurors likely may not have viewed themselves as “plaintiff[s],” may not have actually “dispute[d]” debts owed to health-care providers, and/or may not have necessarily sought to “collect money.” [7]
Further, several veniremembers disclosed prior cases in which each had served as the named plaintiff without specific followup questioning by defense counsel. In fact, as the defendants note in their brief to this Court, both juror A.D. and juror H.T.H. revealed that they had previously been plaintiffs; however, defense counsel asked only whether that pri- or experience would affect their ability to sit on the jury and to render an impartial verdict. Counsel did not strike either on the basis that the prospective juror had previously served as a plaintiff; therefore, given that the defendants knew that each had been a plaintiff in at least one action, we are unable to conclude that the trial court exceeded its discretion in finding that further litigation history would not have further informed the defendants’ decisions — especially given the nature of those other actions.
Moreover, as to the defendants’ claim that the alleged nondisclosures resulted in the seating of a “plaintiff-oriented” jury, we note that only four of the allegedly nonresponsive jurors — A.D., M.F., S.W., and H.T.H. — actually had been a plaintiff in prior actions.[8] (Defendants’ brief, at p. 29.) Further, we cannot conclude that the trial court exceeded its discretion in finding that the prospective jurors would not have understood the limited types of suits identified by the defense counsel’s question to include any of their prior undisclosed cases.[9]
*494 Similarly, as to the claims of undisclosed disputes with Springhill and/or other health-care providers, which may allegedly have tainted the affected jurors’ verdict, we note, as did the trial court, that Spring-hill was not a defendant in this action. Further, although the defendants indicated, through the affidavit of trial counsel, that they struck all prospective jurors who owed “bad debts” to Springhill, nothing in the record suggests that, during his voir dire questioning, defense counsel actually asked the prospective jurors whether they had outstanding or unpaid medical bills owed to Springhill or any other health-care provider. Instead, counsel limited his question to identification of past “disputes” and further qualified that question by referencing an alleged dispute or irritation with a doctor or a hospital, not a billing department or a collection agent, that led to the desire to change providers or led the juror to believe that he or she “had been done wrong.” This would not necessarily include a billing dispute. But see Holly, 925 So.2d at 162 (concluding that juror, who was subject of extensive and ongoing collection efforts by hospital in relation to 10 delinquent accounts could not have reasonably misunderstood and failed to respond when asked the following question during voir dire: “Have any of you ever had a dispute with Huntsville Hospital about anything, a bill, a statement or anything about it?” (emphasis omitted; emphasis added)).
Finally, we note that none of the alleged nondisclosed matters was either a wrongful-death or medical-malpractice case; thus, there is no factual similarity between any of those allegedly nondisclosed matters and the present case. Moreover, there is nothing indicating that the prospective jurors’ alleged failure to respond was something other than the product of faulty memory, inadvertence, or a mere misunderstanding. See Burroughs Corp. v. Hall Affiliates, Inc., 423 So.2d 1348, 1352 (Ala.1982) (holding that the jurors’ failure to remember particular facts inquired about on voir dire and the jurors’ misunderstanding of voir dire questions do not constitute probable prejudice). Without such an indication, there is nothing to counter the trial court’s finding, as set out above, that the defendants presented no evidence demonstrating willfulness by the jurors in failing to respond to questions regarding their litigation histories. See id. (concluding that the trial court’s inclusion of a finding “that there was an absence of any improper motive of any one of the five jurors in failing to respond” was sufficient to support the conclusion that the trial court did not exceed its discretion in failing to grant a new trial on that ground).
Although the defendants were indisputably entitled to truthful responses to their voir dire questioning in order to wisely use their peremptory strikes, see, e.g., Land & Assocs., Inc. v. Simmons, 562 So.2d 140, 148 (Ala.1989), they still bore the burden of demonstrating probable prejudice from the alleged partially truthful or untruthful responses they have identified. The trial judge, who was present during the voir dire examination, was in a better position to determine whether the defendants were or might have been prejudiced. Here, the trial court, based on the reasoned evaluation of the voir dire examination reflected in the trial court’s order, which considered each of the factors this Court has approved for weighing probable prejudice and each of the defendants’ claims in this regard, determined that no probable prejudice to the defendants was shown. While considering what defense counsel was obviously seeking when he asked the questions regarding prior litigation, the trial court was clearly within the bounds of its discretion in considering that the questions — espe- *495 dally as asked — were subject to other reasonable interpretations, including the alternate interpretations posed by the trial court. See Estes Health Care Ctrs., Inc. v. Bannerman, 411 So.2d 109, 112 (Ala.1982) (observing that a voir dire inquiry whether “ ‘any member of the jury panel [has] a close relative — by that, a parent, brother, sister, child — who is at this time or has been in a nursing home or an institution of that kind?’” was qualified and its scope narrowed by the definition of “close relative”; thus, the trial court did not err in finding no probable prejudice in the failure of two jurors to disclose that their grandmothers had resided in nursing homes); and Burroughs Corp., supra. We further note that the trial court’s alternate interpretation is supported by the sheer number of jurors who failed to respond.[10]
Given the phrasing of the voir dire questions posed by defense counsel, the absence of any demonstration of willfulness on the part of allegedly untruthful jurors, the lack of materiality of the alleged undisclosed matters, and the limited scope of our review, we are unable to hold that the trial court exceeded its discretion in concluding both that the cause of the failures to respond was misunderstanding of the questions posed and that no probable prejudice resulted. Simmons, 562 So.2d at 149. But see Conference America, Inc. v. Telecommunications Coop. Network, Inc., 885 So.2d 772, 777 (Ala.2003) (holding that there was no indication that the questions on voir dire were ambiguous or that the juror’s failure to respond was inadvertent and concluding that the nondisclosed matters were material). Therefore, we cannot agree that the trial court was required to grant the defendants’ request for a new trial on this ground. See Union Mortg. Co. v. Barlow, 595 So.2d 1385, 1342-43 (Ala.1992) (concluding that the trial court did not exceed its discretion in denying a motion for a new trial based on the allegation that seven jurors allegedly failed to accurately respond to a voir dire question as to whether they knew the plaintiffs witnesses).

B. Vicarious Liability of Coastal

The defendants further argue that the trial court erred in denying their motion for a new trial because, they contend, “the administration of the wrongful death statute and imposition of punitive damages in this case were unconstitutional.” (Defendants’ brief, at p. 37.) More specifically, they contend, the application of Alabama’s wrongful-death statute, particularly the portion holding Coastal vicariously liable for the actions of Boudreaux and Orte-go, violated Coastal’s guarantees of both due process and equal protection.
The defendants emphasize, as Justice Johnstone noted in his dissent in Ex parte Henry, 770 So.2d 76, 85 (Ala.2000), that “[f]or a plaintiff to recover punitive damages against a principal for vicarious liability for the wrongful act of the agent, § 6-11-27(a)[, Ala.Code 1975,] requires proof of at least one of four kinds of culpability in addition to the essential elements of the tort and the agency traditionally recognized by common law for vicarious liability.” See also Cain v. Mortg. Realty Co., 723 So.2d 631, 633 (Ala.1998) (“[I]n the usual case, a jury may award compensatory damages against a principal based on the general common-law principles of agency, but may award punitive damages only if it finds one of the specific criteria listed in § 6-11-27(a)[, Ala.Code 1975].”). *496 It is well-settled that such a distinction does not apply in wrongful-death cases:
“In wrongful-death cases, however, all damages are punitive damages. See Cherokee Elec. Coop. v. Cochran, 706 So.2d 1188, 1193 (Ala.1997) (stating that only punitive damages are authorized in wrongful-death cases). Thus, in a wrongful-death case there is no need for different evidentiary standards depending on the type of damages that are sought. Instead of subjecting all punitive damages to the heightened eviden-tiary standard of § 6—11—27(a), [Ala.Code 1975,] the Legislature specifically exempted punitive damages sought in wrongful-death actions from the operation of the heightened evidentiary standard. Ala.Code 1975, § 6-11-29 (providing that § 6-11-27(a)’s heightened evidentiary standard ‘shall not pertain to or affect any civil actions for wrongful death pursuant to Sections 6-5-391 and 6-5-410’).”
Cain, 723 So.2d at 633.
In light of the foregoing, the defendants maintain that “because Alabama’s wrongful death statute places no limits on the types of conduct that may be imputed to the principal,” and “[bjecause any action by a principal’s agent that justifies a punitive damage[s] award against the agent will result in the imputation of punitive damages against the principal,” Alabama’s wrongful-death statute both affords “different classes of defendants ... different protections” and “prevents Coastal ... from ordering its conduct to avoid the imposition of large punitive damage[s] awards” and thus deprives Coastal of the fair notice of potentially punitive conduct as required by BMW v. Gore, supra. (Defendants’ brief, at p. 38.)
Initially, we note that the statute does not treat similarly situated defendants differently. The very fact that an alleged wrongful death occurred distinguishes the situation of the defendants in the instant case from defendants protected from vicarious liability for punitive damages in cases involving injuries less than death. See Campbell v. Williams, 638 So.2d 804, 810-11 (Ala.1994) (“We note that Alabama has historically treated actions resulting in death differently from actions causing lesser injury.”). In Alabama Power Co. v. Turner, 575 So.2d 551 (Ala.1991), this Court rejected an argument exactly like the defendants’ argument here, noting:
“Alabama Power contends that the exception of wrongful death actions from Ala.Code 1975, §§ 6-5-410 and -411, violates its equal protection rights under the Fourteenth Amendment. These statutes restrict punitive damages in tort actions other than for wrongful death to acts of oppression, fraud, wantonness, or malice, proved by clear and convincing evidence, and they place a ceiling of $250,000 on such awards. Alabama Power argues that this attempted classification is not a rational method of furthering a legitimate State purpose and, further, that the distinction between punitive damages awards in wrongful death actions and such awards in all other tort actions bears no relation to the statutory purpose.
“The equal protection guarantee requires that a legislative classification is properly drawn. Our review of this issue is limited to whether it is conceivable that the classification bears a rational relationship to an end of government that is not prohibited by the Constitution of the United States. Nowak, Rotunda, and Young, Constitutional Law § 14.3, at 580 (3d ed.1986).
“The exception of wrongful death actions from legislation restricting punitive damages is warranted, because wrongful death actions differ critically from the *497 actions to which the restrictions apply. In Alabama, only punitive damages are available in wrongful death actions, and these damages may be awarded against a defendant based on its negligent conduct. The United States Supreme Court approved Alabama’s policy of awarding punitive damages in wrongful death actions in Louis Pizitz Dry Goods Co. v. Yeldell 274 U.S. 112, 47 S.Ct. 509, 71 L.Ed. 952 (1927). The Court recognized that ‘the purpose of Alabama’s wrongful death act [Homicide Act of Alabama, § 5696, Code of 1923] is to strike at the evil of the negligent destruction of human life’ and concluded: ‘We cannot say that it is beyond the power of a legislature, in effecting such a change in common law rules, to attempt to preserve human life by making homicide expensive.’ 274 U.S. at 116, 47 S.Ct. at 510.
“The protection of the lives of its citizens is certainly a legitimate state interest. By allowing punitive damages to be assessed against defendants in wrongful death actions in a manner different from the way punitive damages are assessed in other civil actions, the legislature has undoubtably recognized that no arbitrary cap can be placed on the value of human life and is ‘attempt[ing] to preserve human life by making homicide expensive.’ 274 U.S. at 116, 47 S.Ct. at 510. The exception of wrongful death actions from legislation imposing caps on the amount of punitive damages that can be awarded in civil actions bears a rational relationship to a legitimate state interest that is not prohibited by the Constitution. Therefore, that exception does not violate the guarantee of equal protection.”
575 So.2d at 556. Thus, contrary to the defendants’ claim, the legislative classification of wrongful-death cases does further a legitimate state interest: protecting the lives of its citizens. Nothing before us indicates that our holding in Turner was either incorrect or is due to be revisited. Thus, stare decisis requires our adherence to the resolution of the defendants’ argument mandated by Turner.
Moreover, as Pettaway notes, and as alluded to in the foregoing quotation, the United States Supreme Court has previously determined that the imposition of vicarious liability without an accompanying finding of fault — as specifically permitted by Alabama’s wrongful-death statute— does not violate accepted notions of due process: “The principle of respondeat superior itself and the rule of liability of corporations for the willful torts of their employees extended in some jurisdictions ... to liability for punitive damages ... are recognitions by the common law that the imposition of liability without personal fault, having its foundation in a recognized public policy, is not repugnant to accepted notions of due process of law.” Louis Pizitz Dry Goods Co. v. Yeldell, 274 U.S. 112, 115, 47 S.Ct. 509, 71 L.Ed. 952 (1927). The Court thus concluded that “[a Legislature] may impose an extraordinary liability ... not only upon those at fault but upon those who, although not directly culpable, are able nevertheless, in the management of their affairs, to guard substantially against the evil to be prevented.” 274 U.S. at 116. Therefore, the argument that Coastal lacked notice that it would be held “directly culpable” for the negligent acts of its agents or employees, if and when such acts ultimately resulted in death, is without merit. Accordingly, the application of Alabama’s wrongful-death statute denied the defendants neither due process nor equal protection of the law, and, as to that argument, the trial court did not exceed its discretion in denying them a new trial. See Acceptance Ins. Co. v. Brown, 832 So.2d 1, 12 (Ala.2001) (“The denial of a *498 motion for a new trial is within the sound discretion of the trial court.”).
C. Application of BMW v. Gore Guideposts
Next, the defendants contend that they were deprived of due process because of the alleged inability of the trial court to apply one of the three factors established by the United States Supreme Court in BMW v. Gore, supra, for assessing the alleged excessiveness of a punitive-damages award.[11] According to the defendants, because one of the Gore factors calls for a comparison of the ratio of punitive damages to compensatory damages, see Gore, 517 U.S. at 580. Alabama’s wrongful-death statute, which, as previously noted, provides solely for an award of punitive damages in a wrongful-death case, “leaves a defendant’s right to due process unprotected.” (Defendants’ brief, at p. 41.)
The defendants note that in Tillis Trucking Co. v. Moses, 748 So.2d 874, 890 (Ala.1999), this Court specifically declined “to overturn more than a century of precedent” despite the noted difficulty in reconciling this Gore factor with our established jurisprudence:
“In Cherokee Electric [Coop. v. Cochran, 706 So.2d 1188 (Ala.1997)], the Court applied the three BMW v. Gore ‘guideposts,’ as well as the Hammond and Green Oil principles of review, and affirmed a $8,000,000 wrongful-death judgment on a verdict in an electrocution case. As to the ratio of punitive damages to compensatory damages, the Court stated: ‘Alabama law allows no compensatory damages in a wrongful death case. This factor, therefore, does not apply here.’ 706 So.2d at 1194. Alternatively, one could say that it does not apply as a mathematical ratio, but, if one considers the purpose behind this factor, it applies in the sense of proportionality between the punitive-damages award and the harm that was caused or was likely to be caused by the defendants’ conduct.... Certainly, death is a great harm. Whether we say that the ratio factor does not apply, as we said in Cherokee Electric, or that it applies in principle without mathematical application, the first ‘guidepost’ from BMW v. Gore does not require this Court to overturn more than a century of precedent based on law awarding only punitive damages in wrongful-death actions.”
748 So.2d at 890.
Nonetheless, the defendants maintain that this Court cannot “ignore the requisite due process analysis mandated by [Gore ].” (Defendants’ brief, at p. 42.) The defendants also specifically request that we overrule Tillis Trucking. In support of that request, they cite pre-Gore United States Supreme Court precedent suggesting that a long-standing practice or interpretation will not protect the wrongful-death statute from constitutional attack, see Williams v. Illinois, 399 U.S. 235, 239, 90 S.Ct. 2018, 26 L.Ed.2d 586 (1970), and they rely heavily on Justice Lyons’s special writing in Mobile Infirmary Ass’n v. Tyler, 981 So.2d 1077 (Ala.2007), in which he expressed dissatisfaction with the above-outlined approach with regard to the application of the Gore comparison factor in wrongful-death cases. 981 So.2d at 1109.
Because Alabama’s wrongful-death statute provides for only punitive damages, *499 Alabama courts are unable to apply formu-laically the pertinent Gore guidepost in examining the reasonableness of a punitive-damages award by comparing it to the compensatory-damages award. See McKowan v. Bentley, 773 So.2d 990, 998 (Ala.1999). As Tillis Trucking makes clear, however, a punitive-damages award in a wrongful-death case may nonetheless be compared and evaluated, though perhaps not in a strictly mathematical sense, by means of a “proportional evaluation” of the awarded amount, the conduct of a defendant, and the resulting harm from that conduct. 748 So.2d at 890. Thus, because the award of punitive damages in a wrongful-death case is subject to a proportionality review, we are not inclined to revisit Tillis Trucking.

D. The Jury’s Alleged “Unbridled Discretion”

The defendants also contend that the “jury’s unbridled discretion” with regard to determining punitive damages under Alabama’s wrongful-death statute denied them due process. (Defendants’ brief, at p. 43.) As noted in Turner, supra—a decision rendered subsequent to Mathews v. Eldridge, 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976), on which the defendants rely — this Court has also, on more than one occasion, considered and rejected this exact claim:
“Alabama Power argues that Alabama’s wrongful death statute denies it its due process rights under the Fourteenth Amendment and Article I, §§ 6 and 13, of the Alabama Constitution because the statute allows only punitive damages, and not compensatory damages, upon a finding of negligence by a preponderance of the evidence, and, further, allows a jury to assess the amount of damages at its discretion. We recently reviewed and rejected this argument in Central Alabama Elec. Co-op. v. Tapley, [546 So.2d 371 (Ala.1989)]. Because these issues are argued generally and collectively in the briefs and because they mirror in many instances the same arguments presented in Tapley, supra, we quote rather extensively from that opinion:
‘“Does the due process clause of the Fourteenth Amendment require that juries be guided by objective criteria in order to properly assess punitive damages? Stated perhaps more accurately, is it fundamentally unfair for a jury to award punitive damages without the guidance of objective criteria?
“ ‘... [T]he only damages available in a wrongful death action brought pursuant to Alabama law are punitive damages. The sanctity of human life, the noble goal of preserving human life, and society’s desire to punish those whose conduct results in the loss of human life, have all been accepted by our Legislature as criteria outweighing the seeming anomaly of permitting punitive damages for simple negligence. This view rests on the premise that one may be adequately compensated for his injuries, but the value of human life has no measure. Punishing the tort-feasor dissuades others from engaging in life-endangering conduct.
“ ‘If a defendant is dissatisfied with a jury’s verdict, and feels that it is excessive, or otherwise flawed, he is entitled to the protection of a variety of safeguards. The defendant may move for remittitur and a new trial in the trial court, and may appeal as a matter of right from the denial of either. He is entitled to a de novo *500 review of the jury’s verdict on appeal. The appellate courts in this state have the authority to order a new trial due to the excessiveness of the verdict, to conditionally order a new trial unless the plaintiff accepts a remittitur, and to order the trial court to conditionally order a new trial unless the plaintiff accepts a remittitur.
“ ‘If a defendant properly moves the trial court to do so, the trial court is obligated to state on the record its reasons for either interfering with the jury’s verdict or not interfering with it. And, in making the determination of whether the verdict is excessive (or inadequate), a trial court is authorized to consider [a] non-exclusive list of factors[.]
‘“Punitive damages should not exceed an amount necessary to accomplish society’s goals of punishment and deterrence. But the degree of punishment necessary to achieve those goals changes with each case. In the rarest cases, involving the most egregious conduct, juries should be entitled to punish defendants so severely as to destroy them; justice demands that. But in the typical punitive damages case, the award should punish without destroying. That, in a nutshell, is the way punitive damages and the civil justice system coexist.
“ ‘The identical case tried to different juries will likely produce different results, but that does not necessarily smack of a lack of fundamental fairness. That is inherent in the nature of juries, given the imperfection of man and his system of justice. Some discretion must be afforded to juries to assess punitive damages as they see fit. We can envision no set of carved-in-granite standards that would guide every jury in every conceivable case. Discretion tolerates elasticity, but the jury’s discretion is by no means unbridled. The “whims” of any given jury are still harnessed by the authority of the trial court and appellate courts.
“‘Due to the safeguards now in place in Alabama, we find no merit to [the defendant’s] allegation that its rights to substantive due process have been denied, or based on the issues preserved for our review, that our wrongful death statute is unconstitutional. We have confidence in our system of civil justice and faith that that system will accommodate change as it is required.’ ”
575 So.2d at 553-56. With no challenge to this rationale, we decline to abandon the precedent in Turner.

II. Remittitur

The defendants also contend that, in the absence of a new trial, they are due, under the guideposts set forth in Gore and the factors set out in Hammond and Green Oil, a further remittitur of the jury’s punitive-damages award based on its alleged excessiveness. We disagree.
The trial court included in its post-judgment order the following findings of fact with regard to the defendants’ remitti-tur request:
“In determining whether a punitive award is grossly excessive, the Court must apply the guideposts set forth in BMW of North Am., Inc. v. Gore, 517 U.S. 559 (1996), and the factors articulated in Hammond v. City of Gadsden, 493 So.2d 1374 (Ala.1986), and Green Oil Co. v. Hornsby, 539 So.2d 218 (Ala.1989).
“BMW Guideposts
“1. Reprehensibility of defendants’ conduct. Application of this guidepost to the evidence points toward a remittitur for the following reasons:
*501 “a. The duration of defendants’ conduct was very short, lasting several hours over the course of one day;
“b. There is no evidence that any of defendants were aware of any hazard which their conduct was likely to cause;
“c. There is no evidence that any of defendants attempted to conceal or cover up the events that led to [Hall’s] death; nor is there any evidence that any of defendants attempted to falsify or alter records of said events; and
“d. There is no evidence of any similar claims or allegations made against defendants.
“2. Ratio of punitive to compensatory damages. This guidepost does not apply in a wrongful-death case. See Lance, Inc. v. Ramanauskas, 731 So.2d 1204, 1218 (Ala.1999).
“3. Similar Criminal and Civil Sanctions
“By reference to comparisons with other wrongful death verdicts affirmed by the Supreme Court, the verdict in this case is ‘out of line.’ See, e.g., Atkins v. Lee, 603 So.2d 937 (Ala.1992) ($6,875 million medieal-malpractice/wrongful-death verdict against hospital and doctor affirmed); Campbell v. Williams, 638 So.2d 804 (Ala.1994) ($4 million medical-negligence/wrongful-death verdict affirmed); Mobile Infirmary Ass’n v. Tyler, 981 So.2d 1077 (Ala.2007) ($3 million medical-negligenee/wrongful-death verdict affirmed); McKowan v. Bentley, 773 So.2d 990 (Ala.1999) ($2 million medical-negligence/wrongful-death verdict affirmed); Smith v. Schulte, 671 So.2d 1334 (Ala.1995) ($2.5 million verdict in medical-negligence/wrongful-death case affirmed).
“HAMMOND/GREEN OIL FACTORS
“1. Reprehensibility of defendants’ conduct. See discussion of BMW Guidepost No.l, supra.
“2. Relationship of the punitive-damages award to the harm that actually occurred, or is likely to occur, from defendants’ conduct. While there is no adequate measure for the value of human life, the punitive-damages award in this case is excessive given the evidence before the Court.
“3. Whether defendants profited. There is no evidence that any of defendants profited from the acts and omissions that formed the basis of [Petta-way’s] claim.
“4. Impact on defendants’ financial position. Based on the evidence of defendants’ net worth and available insurance coverage, the punitive damages award, if upheld or not drastically reduced, will have a crippling effect on the finances of defendants;
“a. Defendant Don Ortego has a negative net worth.
“b. As a professional corporation, defendant Coastal Anesthesia, P.C., (‘Coastal’) does not retain earnings but distributes 100% of its income each year to its physician shareholders after paying its employees and expenses. Based upon the undisputed testimony of defendants’ expert accountant, Tim Gaston, and Exhibits 24 and 25 introduced at the hearing on October 1, 2010, defendant Coastal has a net worth of $284,136.00.
“c. Defendant Randall Boudreaux has a net worth of $151,419.00 when his retirement account, which by law is exempt from levy, is subtracted from his assets. See Exh. 24 introduced at the Oct. 1, 2010 hearing, “d. Together, defendants have $1,000,000.00 in liability insurance coverage. [Pettaway] urges the Court *502 not to remit the verdict because there is evidence that would support a negligent or bad faith failure to settle claim by Defendants against [their insurer] MAG Mutual. Were such claim prosecuted to a successful resolution, the damages would be the amount of the reduced verdict in excess of available liability insurance coverage. Thus, according to [Pettaway], the Defendants have the potential of not feeling any adverse impact at all from the jury’s verdict in this case.
“The Court is familiar with the law concerning assessing a potential negligent or bad faith [failure] to settle claim as set forth in Mutual Assurance, Inc. v. Madden, 627 So.2d 865 (Ala.1993). The court has now reviewed in camera the documents produced by MAG Mutual from its file. Having reviewed the contents of the claims in juxtaposition to the affidavit submitted by [Pettaway’s] counsel, David S. Cain, outlining [Pettaway’s] pretrial efforts to settle the case within policy limits and the efforts by the MAG Mutual adjuster, ... who initially refused [Pettaway’s] settlement offer but then, in the course of the trial, made efforts to settle for less than the policy limits, the Court finds and declares, with respect to the potential failure to settle claims, as follows:
“Having now reviewed the contents of the claims file, the Court is instead convinced from the documents contained within that file, when viewed alongside Mr. Cain’s affidavit, that [the adjuster] did indeed put MAG Mutual’s insureds at risk for an excess verdict when, during the course of the trial, after hearing all the evidence from all the expert witnesses establishing that there were breaches of the standards of care, [the adjuster] elected instead to try to save his employer money while exposing its insureds to the likelihood of an explosive verdict that would far exceed the $1 million coverage limits.
“The law concerning negligent or bad faith failure to settle under such circumstances is well-established. State Farm Mutual Auto Ins. Co. v. Hollis, 554 So.2d 387, 389-90 (Ala.1989), sets forth the duty owed under such circumstances:
“ ‘ “[W]hen an opportunity is presented to the insurer to make a settlement of the claim in an amount not more than the limit of liability, the law raises a duty on his part to use ordinary care to ascertain the facts on which its performance depends if he has not already done so. If the insurer neglects to exercise ordinary diligence in ascertaining these facts, if he has not already done so, and as a proximate result of such neglect he fails to make such a settlement, which is available, and when such knowledge would have caused a reasonably prudent person to do so and a verdict and judgment are rendered against [the] insured in an amount more than the limit of liability in the policy, the insurer should be held liable to the insured for the full amount of the judgment.” ’
“In this case, MAG Mutual’s conduct could be found by a jury to reflect a failure to exercise ‘ordinary diligence’ in ascertaining the explosive facts of liability and in failing to make a settlement for policy limits before the verdict was returned. Here the overwhelming evidence was that [Hall] was an aspiration risk, that the standard of care requires rapid-sequence induction on patients who are aspiration risks, and that Dr. Boudreaux and Mr. Ortego failed to take fundamental and basic steps to determine whether [Hall] was an aspiration risk before beginning to administer drugs of anesthesia. Liability was not *503 objectively questionable under these circumstances. The question wasn’t whether [Pettaway] would receive a verdict, but only how large that verdict would be. MAG Mutual’s failure to settle under those circumstances was unreasonable, and by its actions it clearly exposed its insureds to an excess verdict. There is substantial evidence that would support a claim by the Defendants against their liability insurer for negligent or bad faith failure to settle. MAG Mutual had the opportunity to settle this case within the policy limits pri- or to the commencement of the trial. Certainly, once the evidence began to unfold, MAG Mutual, as a reasonable insurer, should have offered its policy limits and gotten the case settled rather than gambling on the outcome at the expense of its insureds.
“5. Cost to plaintiff of the litigation.
“In the post-judgment hearing, [Pettaway] submitted an affidavit from a bookkeeper employed by her attorneys who attested to the fact that [Pettaway’s] out-of-pocket expenses bringing this lawsuit totaled to-date $126,301.09. Green Oil, 589 So.2d at 223, counsels that this Court must consider whether the punitive damages award sufficiently rewards the Plaintiffs counsel for assuming the risk of bringing the lawsuit and encourages other plaintiffs to bring wrongdoers to trial. One consideration in this calculus is the risk to Plaintiffs counsel of undertaking this particular type of litigation.... In that regard, [Pettaway’s] counsel sought again, through post-trial discovery, information concerning the costs to the Defendants in defending this lawsuit so that [Petta-way] could substantiate her argument that the punitive damages award ought to be large enough both to reimburse [her] out-of-pocket expenses and to reward [her] counsel for undertaking the risks of litigation against Defendants who will spend such large sums in the defense of claims against them.
“A fair and reasonable inference is that medical negligence wrongful death verdicts must be left relatively sizeable if competent and qualified attorneys are to remain motivated[.]
“6. Criminal sanctions and/or civil actions for similar conduct. There is no evidence of criminal sanctions or civil actions against defendants for similar conduct.
“Upon consideration of the foregoing, it is hereby ORDERED, [ADJUDGED] and DECREED that upon the Defendants’ Motion for New Trial, the Court will require remittitur of the $20,000,000.00 punitive-damages verdict to $4,000,000.00 as a condition to the overruling for the Motion for New Trial.”
(Capitalization in original.)
As set out above, based upon its application of the Gore guideposts and the Hammond and Green Oil factors, the trial court remitted the punitive-damages award imposed against the defendants from $20,000,000 to $4,000,000. The defendants contend that the remittitur both was insufficient and “was reached through a process veiled in secrecy which clearly deprived [them] of due process.” (Defendants’ brief, at p. 46.) More specifically, they argue that they were entitled to an increased remittitur under the Gore factors because, they say, their conduct was not reprehensible; the duration of their conduct was brief; they were purportedly unaware of any potential hazard from the alleged routine procedure and did not act with willfulness, wantonness, or intent to harm Hall; they did not attempt to conceal any information related to Hall’s death; and there was no evidence of a history of similar conduct by the defendants. They *504 also contend that the remitted award is disproportionate as compared to the allegedly similar case of Tyler, supra, and this Court’s decision in Mobile Infirmary Ass’n v. Reynolds, 25 So.3d 1203 (Ala.2007) (table), a case decided without an opinion. In addition, the defendants argue that the Hammond and Green Oil factors require further remittitur because, they contend, although human life is immeasurable, the punitive-damages award as remitted is nonetheless excessive; because they did not profit from their conduct; and because they will be “destroyed financially” if the award is not further remitted to an amount equivalent to an amount totaling less than 10% of the defendants’ combined net worth.
“We review the trial court’s award of punitive damages de novo, with no presumption of correctness.” Mack Trucks, Inc. v. Witherspoon, 867 So.2d 307, 309 (Ala.2003) (citing Acceptance Ins. Co. v. Brown, 832 So.2d at 24). The trial court’s application of the Gore guideposts and the Hammond and Green Oil factors is also reviewed de novo. See Tyler, 981 So.2d at 1106. Considering each factor, in turn, we see nothing indicating that the trial court erred in determining the amount of the remittitur.
Initially, as to the defendants’ dispropor-tionality argument, Reynolds is inapposite: it is a no-opinion affirmance and, thus, does not offer a discussion of the applicable factors on which the trial court’s remit-titur and this Court’s affirmance of that remittitur were based. See also Rule 53(d), Ala. R.App. P. (“An order of affir-mance issued by the Supreme Court ... by which a judgment or order is affirmed without an opinion ... shall have no prece-dential value and shall not be cited in arguments or briefs.... ”). Similarly, although the holding in Tyler included a remittitur of a $5,500,000 punitive-damages award to $3,000,000, that case, too, did not include a recitation of the factors on which the remittitur was based.[12] Therefore, the defendants’ reliance on those cases does not support the claim that the present award is disproportionate, nor does the cited authority convince us that the trial court erred in not further remitting the punitive-damages award.
Additionally, the trial court performed a comparison of the present award with those in similar cases and determined that it was not disproportionate. The cases cited by the trial court in this regard confirm that the remitted award in the instant case is not an unusually large amount in comparison with awards affirmed in other wrongful-death cases. See, e.g., Campbell v. Williams, 638 So.2d 804, 818 (Ala.1994) (affirming trial court’s denial of a remitti-tur of a punitive-damages award in a wrongful-death case based on the “con-clu[sion] that the $4 million punitive damages award ... [did] not exceed an amount necessary to punish Dr. Campbell for his action and to deter him and others from committing similar acts in the future”). Further, given the possibility that the defendants may, by means of their potential bad-faith and/or negligent-failure-to-settle claim — discussed below — avoid any impact of the remitted award, we cannot agree that the remitted amount is disproportionate.
The defendants’ claim that the remitted amount is financially devastating is unavailing. Including the available insurance coverage and relying on their individual net worths as calculated by the trial court, the defendants claim a combined net worth of $1,435,555. They cite authority for the *505 proposition that a punitive-damages award “should sting but should not destroy” a defendant, see Orkin Exterminating Co. v. Jeter, 832 So.2d 25, 42 (Ala.2001), and cases suggesting that an award in excess of 10% of a defendant’s net worth is excessive. We note, however, that none of the cases cited by the defendants in support of their argument is a wrongful-death case.
The defendants are correct that, in BMW of North America, Inc. v. Gore, 701 So.2d 507 (Ala.1997), on remand from the United States Supreme Court, we “suggested” that following our remand the trial court “might consider whether a punitive damages award that exceeds 10% of the defendant’s net worth crosses the line from punishment to destruction, particularly where the defendant’s conduct is not highly reprehensible.” 701 So.2d at 514. However, that suggestion does not represent, as the defendants seem to argue, this Court’s implementation of a definitive rule that a punitive-damages award may not exceed 10% of a defendant’s net worth. To the contrary, as we observed in McKowan v. Bentley, 773 So.2d 990 (Ala.1999), “Alabama law does not impose specific limits on the amount that may be recovered in a wrongful death action.” 773 So.2d at 999. See also § 6-11-21(j), Ala.Code 1975. Further, the 10% recommendation appears to have been applied only in a non-wrongful-death setting. Specifically, in Jeter, we held that a punitive-damages award of approximately 10% of the corporate defendant’s net worth, resulting “from misconduct during a single transaction not involving loss of life or limb,” weighed in favor of finding the award excessive. 832 So.2d at 42 (emphasis added). Although this case and the resulting judgment stem, too, from a single act the trial court apparently deemed less reprehensible than some, it is undisputed that the defendants’ conduct here resulted in death. That fact, alone, removes the present case from application of the “rule” urged by the defendants.
Finally, as Pettaway notes, both Bou-dreaux and Coastal appear to have sufficient assets and/or income to allow them to pay the remitted award. The $1,000,000 in available insurance coverage, which accounts for one-quarter of the remitted award, has already been paid to the clerk of the trial court. Additionally, despite its computed net worth based on a corporate structure that apparently distributes all net income as dividends, the record reflects that Coastal is a profitable business that, from 2006 to 2009, generated annual billings in excess of $8,000,000[13] and netted annual revenues in excess of $5,000,000.[14] Given the defendants’ income and the strength of their bad-faith claim, as evaluated by the trial court, there is no evidence demonstrating that the current award will financially devastate the defendants.
We are also unpersuaded by the defendants’ contention that statements to the jury by Pettaway’s counsel noting that Hall was “a wife, mother, daughter, family member, and breadwinner” justify further remittitur. (Defendants’ brief, at pp. 53-54.) Specifically, they argue that an additional remittitur is required to offset the *506 impact of the allegedly improper argument by Pettaway’s counsel.
In examining a similar claim in Atkins v. Lee, 603 So.2d 937 (Ala.1992), we explained:
“The rationale underlying the Alabama Wrongful Death Act, which allows recovery of punitive damages only, ‘rests upon the Divine concept that all human life is precious.’ Estes Health Care Centers, Inc. v. Bannerman, 411 So.2d 109, 113 (Ala.1982) (emphasis added). Thus, in argument, counsel must distinguish between the value of human life in general, as opposed to the value of a particular life — a distinction that is not always easy to articulate.
“References in counsel’s argument in this case to the ‘unique qualities of the individual’ blur that distinction.”
603 So.2d at 942. We further held in Seaboard Coast Line R.R. v. Moore, 479 So.2d 1131, 1136 (Ala.1985), that “[t]he standard of review by this Court on claims of improper argument is that we will not reverse unless substantial prejudice resulted, and there is a presumption in favor of the trial court’s ruling.”
The defendants do not cite to the portions of the record where the alleged prejudicial argument occurred, indicate whether they objected at the time the argument was made, or explain whether curative steps were taken by the trial court. Moreover, the record reflects that, in his opening statement, Pettaway’s counsel informed the jury that, per our wrongful-death statute, “every life is precious” and that “[t]he focus is not on the loss ... [or] what’s happened to the family-” Similarly, when Pettaway’s counsel announced his intention to call Pettaway to testify, the defendants, renewing one of the grounds from their pretrial motion in limine, sought to exclude any and all reference to damages as compensating for a loss and objected on grounds that “there [was] no legitimate reason to call [her] and have her testify about the family situations because it’s a wrongful death case.” The trial court agreed, permitting Pettaway to testify only as to the nature of her relationship with Hall as a means of explaining her presence during Hall’s stay at Springhill and her personal observations of Hall’s physical condition during that time, but specifically noting that “[it would] not allow her to go into any of her family situation” and “[n]ot the kids.”[15] At that time, Pettaway’s counsel stated that “[they had] been trying to be as clear as [they could], even from opening statement, describing what is the element of damages in a wrongful death case. And that it is not a compensatory statute.” Similarly, in his closing arguments, Pettaway’s counsel reiterated that the damages the jury could award were not to compensate for the loss of life.[16]
Finally, it is undisputed that the trial court properly instructed the jurors that their verdict should not be based on “sympathy or prejudice or emotion,” that anything the attorneys may have said during the course of the trial was not evidence, and that any remark by an attorney that was contrary to the trial court’s instruc *507 tions or any excluded evidence must be disregarded by them.[17] The trial court further instructed the jurors as follows:
“Damages in this type of action are entirely punitive, imposed for the preservation of human life and as a deterrent to others to prevent similar wrongs. The amount of damages should be directly related to the amount of wrongdoing on the part of the Defendants.
“In assessing damages you are not to consider the monetary value of the life of the decedent. [Damages in this case] are not recoverable to compensate the family of the deceased from a monetary standpoint on account of her death, nor to compensate [Pettaway] for any financial or pecuniary loss sustained by her or the family of the deceased on account of her death.
‘Your verdict should not be based on sympathy, prejudice, passion or bias, but should be directly related to the culpability, that means the amount of wrongdoing, of the Defendants and the necessity of preventing similar wrongs in the future.”
Clearly, the descriptive labels allegedly applied to Hall here do not rise to the level of impermissible comment, which this Court considered and found objectionable in Lance, Inc. v. Ramanauskas, 731 So.2d 1204 (Ala.1999)—the sole authority on which the defendants rely in support of this claim. Specifically, Lance, in which a 10-year-old boy died after being electrocuted while attempting to purchase a snack from a vending machine, involved alleged “improper references to compensatory damages and to the parents’ mental anguish,” including repeated references to “the suffering of the parents and the family.” 731 So.2d at 1215. See also Cherokee Elec. Coop. v. Cochran, 706 So.2d 1188, 1195 (Ala.1997) (rejecting a claim that a comment by plaintiffs counsel that “[t]here is no price that you can pay for a daddy[,]” amounted to a request for compensatory damages or was so inflammatory as to require reversal); Hardin v. Sellers, 270 Ala. 156, 117 So.2d 383 (1960) (noting the impropriety of argument by plaintiffs attorney in a wrongful-death case clearly asking the jury to award compensatory damages). Here, we do not conclude that the labels Pettaway’s counsel used to describe Hall were a plea for compensatory damages, were a plea for compensation based on characteristics unique to Hall, or were otherwise so inflammatory that they prejudiced the outcome of a case involving, as the trial court noted, such “explosive facts.”
Therefore we see nothing to suggest that the comments here approach a blurring of the distinction between the value of all human life and the value of the life of a particular individual. Even assuming, as the defendants argue, that the comments of Pettaway’s counsel could be construed as emphasizing the value of Hall’s life in particular and perhaps in a roundabout way calling for the imposition of compensatory damages, we conclude that the trial court’s instructions to the jury alleviated any potential confusion in that regard. See Lance, 731 So.2d at 1216 (“Our cases have held that [the trial court’s proper instruction to the jury that only punitive damages may be awarded in a wrongful-death case] can dispel possible confusion over the proper measure of damages generated by an improper argument as to the value of a particular life.” (citing Atkins, 603 So.2d at 942)). Moreover, to the extent any alleged improper argument *508 purportedly affected the jury’s award, that effect was appropriately mitigated by the trial court’s substantial remittitur of the jury’s punitive-damages award. See Lance, 731 So.2d at 1216. We are thus unable to conclude that substantial prejudice resulted from the alleged improper comments or that the trial court erred in refusing to grant the defendants a further remittitur on this ground.
The defendants’ final challenge to the trial court’s remittitur is that, in calculating the remitted judgment amount and, more specifically, in calculating the defendants’ assets, the trial court erred in considering the contents of the claim file compiled by the defendants’ liability-insurance carrier and in including among the defendants’ assets a potential bad-faith and/or negligent-failure-to-settle claim against the carrier. The defendants and their carrier objected on the ground that the claim file was subject to the attorney-client privilege, see Rule 502, Ala. R. Evid., and that it contained attorney work product, see Rule 26(b), Ala. R. Civ. P.
The trial court, relying on Mutual Assurance, Inc. v. Madden, 627 So.2d 865 (Ala.1993), in which a majority of this Court concluded that “[i]t is within the trial court’s discretion to ascribe a reasonable present value to [a defendants’ bad-faith or negligent-failure-to-settle claim], and to consider such an asset on the remit-titur issue,” 627 So.2d at 866, granted Pettaway’s motion to compel in camera production of the claim file. However, in light of the defendants’ claims of privilege, the trial court specifically ordered that any specific attorney-client communications could be either redacted or removed before its review of the file.
The trial court denied a subsequent motion by the defendants seeking a protective order, and the defendants petitioned this Court for mandamus review. In that petition, the defendants maintained that the file contained privileged and protected documents, that there was no applicable exception to the privileges, and that they did not waive — and the trial court could not force them to forfeit — those privileges.
This Court, by an unpublished order, denied the petition. Ex parte Boudreaux, (No. 1091492, September 21, 2010) (Ala.2010).[18] Following that denial of the defendants’ request for mandamus relief, the trial court performed an in camera review of the claim file. It included its findings based on that review in its order on the defendants’ postjudgment motion and as part of its evaluation of the Hammond/Green Oil factors.
As to this issue on appeal, the defendants repeat the arguments they made to the trial court and in their mandamus petition. In Madden (a virtually identical factual setting where there was no apparent waiver of available privileges), this Court held that an insurance-claim file was relevant to the consideration of a remittitur because, “in determining the financial impact of a punitive damages award on a defendant, a trial court should determine ‘the true impact on the defendant.’ ” 627 So.2d at 866 (quoting Killough v. Jahandarfard, 578 So.2d 1041, 1047 (Ala.1991)). That was true even though, at the time of the trial court’s remittitur evaluation, the failure-to-settle claim remained merely a “potential” claim. 627 So.2d at 866. Al *509 though it is true that the defendants in the instant case “did not ... put at issue the contents of ... communications with their attorneys or insurer,” they did put at issue, in seeking a remittitur on that ground, the excessiveness of the jury award based on the alleged devastating financial impact such award would have on the defendants. (Defendants’ brief, at p. 59.) Ex parte Vulcan Materials Co., 992 So.2d 1252, 1261 (Ala.2008) (“[A] defendant cannot argue as a basis for reducing the punitive-damages award that the award ‘stings’ too much, in the absence of evidence of the defendant’s financial status.”). The defendants’ having raised that issue, the trial court was entitled to conduct a full review to assess the award’s “true impact” on the defendants’ financial status.
Here, it appears that the trial court took reasonable precautions in an effort to respect the privileges asserted by the defendants in allowing them to withhold or redact communications between the defendants and their attorneys. Despite this leeway, the defendants and their insurer apparently opted neither to withhold nor to redact any of the information contained in the claim file. Moreover, for all of their privilege-based arguments and citation of the potential dangers of such a practice, the defendants do not demonstrate how, in this particular case, they were actually prejudiced by the trial court’s in camera review of the claim file. Further, there is no argument that the trial court lacked sufficient information to adequately assess the defendants’ potential claim against their insurer. See Tillis Trucking, 748 So.2d at 887 (distinguishing that case from Madden on the grounds that the record in Tillis Trucking both contained “countervailing evidence” and lacked the “considerable evidence” supporting a present-value determination that was available to the trial court in Madden).
The defendants further argue that the trial court’s consideration of the potential merits of their claim against their insurer was arbitrary in that the trial court failed to state whether it found the existence of a potential negligent-failure-to-settle, versus a bad-faith-failure-to-settle, claim. However, it appears that the alleged separate methods of proving either theory of recovery are not material. As stated in State Farm Mutual Automobile Insurance Co. v. Hollis, 554 So.2d 387, 392 (Ala.1989): “In Waters [v. American Casualty Co. of Reading, Pa., 261 Ala. 252, 73 So.2d 524 (1954)], we recognized causes of action for negligence or bad faith in not settling a claim.” More specifically, Waters concluded that the insured may pursue the insurer for either or both, and that, in fact, “separate counts, one charging negligence and one charging bad faith may be joined in the same complaint.” 261 Ala. at 258, 73 So.2d at 528. In any event, liability is the same under either theory: “Alabama law states that a liability insurer may be liable to its insured beyond the policy limits for the insurer’s negligence or bad faith in failing to settle claims against its insured within policy limits when a judgment greater than the policy limits is later obtained against the insured.” Turner Ins. Agency v. Continental Cas. Ins. Co., 541 So.2d 471, 472 (Ala.1989). Thus, regardless of the theory of recovery or the method of proof, the measure of damages is the same for each and would reheve the defendants of responsibility for the amount of the judgment exceeding their coverage. Id. See also Hollis, 554 So.2d at 390.
The defendants further contend that the trial court assigned a “hypothetical ‘value’” to their potential bad-faith claim based on purported speculative and undisclosed findings and without allowing them the opportunity to respond; this, the defendants allege, constituted a denial of due process. (Defendants’ brief, at p. 62.) *510 They further suggest, in light of subsequent decisions of the United States Supreme Court generally emphasizing the importance of judicial review of punitive-damages awards and the due-process concerns associated therewith, that Madden was incorrectly decided and is due to be overruled.
We note that there is nothing to suggest that the trial court assigned a dollar value, hypothetical or otherwise, to the defendants’ potential bad-faith claim, despite Madden’s express authorization for it to do so. See Madden, 627 So.2d at 866 (“Certainly, it is within the trial court’s discretion to ascribe a reasonable present value to this interest, and to consider such an asset on the remittitur issue.”). Instead, the record is rife with assurances by Pettaway’s counsel that he was not asking for the assignment of an exact dollar value, and the trial court repeatedly insisted that it believed its role was to determine whether there was a potential source of recovery, i.e., an additional asset that prevented the jury’s award from having the devastating effect alleged by the defendants. Pettaway sought a finding solely as to the existence, viability, and potential merit of that claim.
The trial court’s findings, as reflected in its postjudgment order, similarly reflect that, in reviewing the claim file, it considered, as another asset possessed by the defendants, only the strength of the potential claim and, given the possibility that the insurer would ultimately be held liable for the full amount of the judgment exceeding the available coverage, whether the judgment amount constituted excessive punishment as the defendants alleged. The trial court made detailed findings explaining its evaluation of the merits of the potential claim and the evidence it had considered in reaching that determination. Although Madden certainly would have supported such an undertaking by the trial court, it appears that, here, the trial court did not assign a numerical value to the claim but, in evaluating the defendants’ claims that the award would financially devastate them, merely evaluated the likelihood that a third party might ultimately be held responsible for payment of any amount exceeding the available insurance coverage.
Contrary to the defendants’ arguments, this Court’s decision in Madden was intended to promote the “ ‘meaningful and adequate’ judicial review of a punitive damage[s] award,” which the defendants themselves maintain is constitutionally required. (Defendants’ brief, at p. 66.) The defendants cite no convincing authority suggesting that Madden was, in fact, incorrectly decided. In the absence of such authority, we are unable to conclude that the trial court, which followed to the letter the guidelines previously established by this Court, erred in failing to further remit the amount of the jury verdict.[19]

*511
Conclusion

Based on the foregoing, we conclude that the trial court correctly denied the defendants’ request for a new trial and appropriately refused to further remit the jury’s punitive-damages award. Accordingly, the judgment is due to be affirmed.
AFFIRMED.
MALONE, C.J., and WOODALL, STUART, BOLIN, PARKER, MAIN, and WISE, JJ., concur.
MURDOCK, J., dissents.

. Given that the present appeal arises from the denial of a motion for a new trial, the facts presented here are those gleaned from reviewing the evidence in the light most favorable to Pettaway, the nonmovant. See Zanaty Realty, Inc. v. Williams, 935 So.2d 1163, 1166-67 (Ala.2005) ("A motion for a new trial tests the weight and preponderance of the evidence. King Motor Co. [v. Wilson], 612 So.2d [1153,] 1157 [(Ala.1993)]. A jury verdict is entitled to a presumption of correctness, and this Court will not reverse the denial of a motion for a new trial unless the evidence, seen in the light most favorable to the nonmovant, shows that the jury verdict was plainly and palpably wrong. Christiansen v. Hall, 567 So.2d 1338, 1341 (Ala.1990).”).

. Springhill was not named as a defendant in the underlying action.

. In reaching the decision as to the type of induction procedure that would be used on Hall, both Boudreaux, who allegedly arrived at the hospital only minutes before Hall’s surgery, and Ortego relied solely on a pre-anes-thesia evaluation report completed by another Coastal employee, who was not named as a defendant in the underlying action.

. During his trial testimony, Ortego conceded that "pulmonary aspiration of gastric contents during anesthesia is considered a preventable complication of anesthesia.” He also repeatedly admitted that his conduct in administering anesthesia to Hall amounted to a breach of the applicable standard of care.

. During his prior questioning of the venire, counsel for Pettaway had also asked whether any prospective juror or any member of the prospective juror’s immediate family had been a "defendant in a civil lawsuit,” to which he received no affirmative response.

. When offering alleged race-neutral grounds in support of peremptory strikes during Petta-way’s challenge pursuant to Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), defense counsel noted that he "struck everyone on the jury who had a bad debt that was reported to us at Spring-hill....”

.This could explain why affected jurors similarly failed to respond to questions from both Pettaway’s counsel and from defense counsel calling for identification of those who had previously been defendants. See note 5, supra. Moreover, defense counsel conceded at the hearing on the new-trial request that he failed to inquire whether any of the prospective jurors had ever filed for bankruptcy protection; however, he contended that that question was unnecessary because of his general question regarding disputes with healthcare providers. That said, questions regarding "disputes” were limited to those "where [prospective jurors] were upset enough that [they] wanted to change hospitals or change doctors or ... thought something had been done wrong to [them] by a doctor or doctor or a hospital.” Nothing within the framework of the question posed suggests that it was aimed at ferreting out prospective jurors who merely owed outstanding debts to healthcare providers.

. As to the defendants’ contention that Petta-way’s counsel purportedly exploited the jurors’ alleged bias in her favor by engaging in improper and prejudicial argument, we reject the merits of that claim as discussed in Part II, infra.

. For example, the prospective jurors could have understood the question whether they had been a "plaintiff” in a "suit to collect money” to refer to an action to "collect” a debt owed to them, not an action for damages, such as S.W.'s case stemming from an automobile accident. Moreover, A.D.’s alleged undisclosed roles as "plaintiff” actually consisted of pre-action discovery and a suit brought on behalf of another, which the trial court could have concluded would not have been understood as a suit of the nature of those described by defense counsel.

. In fact, the defendants’ new-trial motion included claims that an additional juror, O.S., who served as an alternate, also failed to respond. On appeal, however, the defendants have apparently limited their argument to jurors who actually deliberated.

. Those three factors are: “(1) [T]he degree of reprehensibility of the defendant's conduct; (2) the ratio of the compensatory damages award to the punitive damages award; and (3) the difference between the punitive damages award and comparable awards in similar cases." Cherokee Elec. Coop. v. Cochran, 706 So.2d 1188, 1194 (Ala.1997).

. We note that the tortious acts of the defendants in Tyler appear to be far less egregious than the acts of the defendants in the instant case.

. Testimony at the postjudgment hearing suggested that the stated annual billing amounts for Coastal may include adjustments made by insurance companies for amounts the insurance companies ultimately do not pay; regardless, however, there can be no dispute that Coastal is a profitable enterprise.

. The record further reflects that, from 2006 until mid-2010, Coastal distributed $11 million to its seven physician members, including Boudreaux.

. However, as Pettaway's counsel pointed out to the trial court, Hall’s medical records, which were admitted into evidence during the trial, reflected "that [Hall] has two children and the age of the children.”

. During closing argument Pettaway’s counsel stated that the jury could not "focus on what's been lost from the family from her not being a breadwinner.” (Emphasis added.) Defense counsel objected to the statement as inappropriate, and the trial court, in effect, sustained the objection, reminding jurors that "[t]he Court [would] instruct [them] on the damages.”

. At the conclusion of Pettaway’s testimony, when she was questioned as to whether "anyone ever [told her] they were soriy," the trial court sustained the defendants' objection to the question as improper and instructed the jurors to disregard Pettaway’s response.

. Our denial of the mandamus petition does not have res judicata effect. See EB Invs., L.L.C. v. Atlantis Dev., Inc., 930 So.2d 502, 510 (Ala.2005) (“Alabama law is clear: ‘ "[Tjhe denial [of a petition for a writ of mandamus] does not operate as a binding decision on the merits.” ' ” (quoting Ex parte Shelton, 814 So.2d 251, 255 (Ala.2001), quoting in turn R.E. Grills, Inc. v. Davison, 641 So.2d 225, 229 (Ala.1994))).

. Justice Murdock contends in his dissent that the discussion in Madden whether a defendant’s claims against an insurer could be considered as a potential asset of the defendant for purposes of examining a remittitur is dicta. As noted above, the Madden Court stated: "Certainly, it is within the trial court’s discretion to ascribe a reasonable present value to this interest, and to consider such an asset on the remittitur issue.” 627 So.2d at 866. This principle of Madden was applied in Tillis Trucking: "In [Madden ], the Court held that the circuit court had not erred in considering, on the question whether a punitive-damages award was excessive, the defendant doctor's 'potential for recovering from the insurer the amount of the judgment against him that exceeds the amount of his insurance coverage.' 627 So.2d at 866.” Tillis Trucking, 748 So.2d at 887 (emphasis added). Acting on the premise that the consideration of a defendant’s potential lawsuit against his insurer could be an asset, the Court then considered whether the record supported the consideration of such potential asset in that case:
*511 "The pendency of the bad-faith action by Tillis Trucking against its insurer cannot affect the remittitur here, because the bad-faith claim is too speculative for this purpose, is not shown to be supported by ‘considerable evidence,' as the claim in Madden was, and is shown to be subject to substantial countervailing evidence.”
Tillis Trucking, 748 So.2d at 887-88.